MYLES S., a minor, By and Through his next friends and parents, SS and DS; and SS and DS, Plaintiffs,

v.

MONTGOMERY COUNTY BOARD OF EDUCATION, et al., Defendants.

Civ. A. No. 92–T–602–N.

United States District Court, M.D. Alabama, N.D.

Feb. 25, 1993.

Jeffery C. Duffey, Montgomery, AL, for plaintiffs.

James R. Seale, Sarah Lu Williamson Parrish, Robinson & Belser, Montgomery, AL, for defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

Plaintiff Myles S., a multi-handicapped and speech-impaired child, contends that the Montgomery County School System has failed to provide him with the "free appropriate public education" to which he is entitled under the Individuals with Disabilities Education Act (formerly the Education of the Handicapped Act and now commonly referred to as the IDEA), 20 U.S.C.A. §§ 1400, et seq.[1] Myles's parents have brought this action on his behalf. His parents base this lawsuit on the IDEA and on the due process and equal protection clauses of the fourteenth amendment of the United States Constitution and the Alabama PreSchool Special Education Act, Ala.Code 1975, § 16–39A–1 et seq. The defendants are the Montgomery County Board of Education and certain of its employees.[2] Based on the evidence present-

---

1. At Myles's request, his full name has been filed under seal with the court.

2. Myles's parents have named as defendants the Montgomery County Board of Education, its su-

perintendent, its special education coordinator, and the principal of Myles's school. Because the individual defendants are sued in their official capacities only, the court does not consider them

ed, the court concludes that the school system has complied with most but not all of the provisions of the law relied upon by Myles's parents.

## I. BACKGROUND

Myles, who is now four years old, is a student in the Montgomery County School System. Myles's developmental age is only six months. On April 15, 1991, the school system received an application from Myles's parents requesting special educational services for Myles. [PX1] Prior to that time, Myles was enrolled in a private program. [Apr. 9, R. 6] On June 14, 1991, the school system determined that Myles was eligible for special educational services. [PX2] Despite this eligibility determination, the school system did not immediately notify Myles's parents of its decision due to uncertainty as to whether a special education program for three- and four-year-old pre-schoolers would be federally funded. [DX8]

On July 29, 1991, the Alabama legislature enacted the law that permitted the federal funding of special educational services for pre-schoolers to proceed. On July 31, the school system mailed a notice to Myles's parents that he had been determined eligible for special education. Myles's parents requested that an individualized educational program, commonly referred to as an IEP, be developed for Myles before the school year began in accordance with federal law. At a meeting on August 9, which Myles's parents attended, a preparatory or "interim" IEP was developed for the period from August 28 (the first day of school) to September 9. [Apr. 9, R24-25]

On September 9, Myles's IEP Committee met again and developed a permanent IEP for Myles. [Apr. 9, R34] At that meeting, Myles's parents made certain requests for programs in the IEP. Some requests were granted and others denied. The written IEP was provided to Myles's parents on September 27. On October 2, Myles's parents requested in writing certain revisions to the IEP. School officials made some revisions

and forwarded the IEP to Myles's father, who signed it and returned it to school officials on November 3.

Myles's parents had requested extended school year services (services over the summer) for Myles as early as the interim IEP meeting on August 9. [Apr. 9, R31] However, the school system did not evaluate Myles for these services until after the spring holidays because it found that no determination could be made until then. In part due to the school system's refusal to evaluate Myles, Myles's parents requested a due process hearing through the State Board of Education on March 4, 1992. Myles's parents also asserted a number of other substantive and procedural violations.

At the hearing, which was held on April 8, 1992, the following individuals, who had all worked with Myles, testified: Myles's occupational therapist, his certified occupational therapist assistant, his physical therapist, his speech pathologist and his classroom teacher. Each person stated that, due to Myles's profound mental retardation, he had made only small progress in the areas of his educational instruction. They also testified that they saw no significant regression in his abilities following Christmas vacation. This break, along with spring vacation, were the only portions of the school year where there was an interruption in the special education services that Myles received and thus the only periods from which to measure the need for extended school year services.

After conducting the hearing, the due process hearing officer found that the school system had provided Myles a free appropriate public education. The officer rejected Myles's procedural objections and ruled that Myles's IEP was sufficient. As to extended school year services, the officer ordered the school system to provide Myles with physical therapy on a 30-minute basis once a week for the summer period. In addition, the officer directed the school system to continue to provide training materials to Myles's parents so that they could continue to provide home

to be separate from the school system, and the court therefore refers to all defendants as the

Montgomery County School System.

instruction to Myles. The hearing officer also directed the school system to evaluate Myles within seven days of the officer's decision for other extended school year services.

On April 27, 1992, the IEP Committee met and determined that Myles would receive three 30–minute occupational therapy sessions during the summer months. Myles's parents have testified that, during the summer, the school system failed to provide training material to them and that the therapists missed two sessions. Myles's father has testified in an affidavit that during the summer Myles significantly regressed in the areas of critical skills involving feeding and that, as of November 1992, Myles had not regained his feeding skills.

## II. DISCUSSION

Myles's parents have brought this action under the IDEA challenging the hearing officer's decision, *see* 20 U.S.C.A. § 1415(e)(2), and the school system's alleged subsequent failure to abide by the IEP and the officer's rulings concerning extended school year services. As required by the IDEA, the court has read the record of the administrative proceeding and has allowed each side to present additional evidence. *Id.* The court must now decide whether the claim filed by Myles's parents has merit and, if so, what relief is appropriate. The court must give the findings of the hearing officer "due weight." *Board of Educ. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). However, the court "is free to accept or reject" the administrative findings of fact, *Jefferson County Bd. of Educ. v. Breen,* 853 F.2d 853, 857 (11th Cir.1988), though the court must base its decision on the "preponderance of the evidence." 20 U.S.C.A. § 1415(e)(2). The hearing officer's legal conclusions will be reviewed de novo.

The IDEA provides federal funds to assist state and local governments in educating handicapped children. In order to receive money, states are required to provide a "free appropriate public education" to all disabled children within their jurisdictions. 20 U.S.C.A. § 1412(2)(B). Towards this end, the Act confers on handicapped students both procedural and substantive rights.

*Honig v. Doe,* 484 U.S. 305, 310–12, 108 S.Ct. 592, 597–98, 98 L.Ed.2d 686 (1988). As to the former, "the Act establishes a comprehensive system of procedural safeguards designed to ensure parental participation in decisions concerning the education of their disabled children and to provide administrative and judicial review of any decisions with which those parents disagree." *Id.* at 308, 108 S.Ct. at 596. Myles's parents claim that the school system has violated a number of procedural safeguards.

As to substantive rights, a disabled student has a right to "personalized instruction with sufficient support services to permit the child to *benefit educationally* from that instruction." *Rowley,* 458 U.S. 176, 203, 102 S.Ct. 3034, 3049 (emphasis added). The "primary vehicle" for delivering this personalized instruction is the IEP. *Honig,* 484 U.S. at 311, 108 S.Ct. at 597. The IEP "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives. [20 U.S.C.A.] § 1401(19)." *Id.* at 311, 108 S.Ct. at 598. The Act requires that an IEP be developed for each disabled child and that it be the product of a meeting between a representative of the local school district, the child's teacher, and the child's parents or guardian. § 1401(19). The IEP must be reviewed and, if necessary, revised, at least once a year. A parent or guardian who disagrees with a child's IEP may seek administrative review and, if that proves unsatisfactory, may file suit in a federal or state court. § 1415(b), (c), (e)(2). The "state is not required, however, to maximize the handicapped child's potential; rather, the state must provide the child a 'basic floor of opportunity,' consisting of access to specialized instruction and related services." *Doe v. Alabama State Dep't of Educ.,* 915 F.2d 651, 665 (11th Cir.1990) (quoting *Rowley,* 458 U.S. at 200–01, 102 S.Ct. at 3048).

*Timeliness.* The school system received Myles's application for special education services by April 15, 1991, and determined that he was eligible for special education services

on June 14, 1991. School officials did not intend to provide an IEP for Myles prior to his ·entering preschool because he had never been in the school system before and appropriate time would be needed to evaluate him. However, at the urging of Myles's parents, the school system held a meeting with Myles's parents on August 9 and developed on that date a preparatory IEP, which the school system has termed an "interim IEP." The school year began on August 28. On September 9, approximately two weeks into the school year, the. school system held a "permanent IEP" meeting with Myles's parents and on September 9 instituted the IEP to be used for the school year. Although Myles's parents did not receive a written copy of the IEP until September 27, the IEP was in effect as of September 9.

Myles's parents maintain that the school system denied Myles a free appropriate public education by failing to abide by two of the IDEA's time requirements. First, they argue that the school system failed to conduct a meeting to develop an IEP within 30 days of the school system's determination that Myles needed special education. Second, they argue that the school system failed to have an IEP in effect for Myles before the 1991–92 school year began. In addition, they contend, without elaboration, that the school system violated the equal protection clause of the ·fourteenth amendment to ·the United States Constitution by failing to process Myles's application in the summer of 1991 in a timely manner.

■ As to the equal protection claim, Myles's parents have not explained which part of the process was untimely. It is not clear whether they are referring to the ˙two-month period from April 15 to June 14, when the school system determined Myles to be eligible, or the one-and-a-half month period from June 14 to July 31, when Myles's parents were informed of the determination. It is also unclear whether this claim was asserted in the due process hearing. Nevertheless, the court will address the issue. Myles's parents have not shown that the processing of Myles's application should have proceeded more quickly or how they were harmed by the delay. In addition, the school system acted in good faith in processing Myles's application. Any delay was attributable to the school system's confusion as to whether funds would be available for a preschool program for handicapped children for the 1991–92 school year. Thus, the court rejects the equal protection claim. ˙

■ The school system's response to Myles's parents other two timeliness claims is that the IDEA's regulations did not apply to˙ it until July 29, when the Alabama Legislature enacted a law providing special education for preschool children and enabling Alabama public schools to receive federal funding. Counting from this July 29 date, the school system contends that it complied with the IDEA's time requirements by holding a preparatory IEP meeting on August 9 and instituting a preparatory IEP on that date. The hearing officer agreed, finding that the IDEA's requirements did not apply until July 29 and that the preparatory IEP was appropriate. ˙

The court need not decide when the IDEA first applied because even if the July 29 date is correct, the school system's use of a preparatory IEP still failed to meet the IDEA's requirements. The IDEA describes the content of an IEP and makes no mention of a preparatory or "interim" IEP. 20 U.S.C.A. § 1401(a)(20); 34 C.F.R. § 300.346. The statute requires that the school system "will establish or revise, whichever is appropriate, an individualized education program for each child with a disability . . . at the beginning of each school year. . . ." 20 U.S.C.A. § 1414(a)(5).

Although the statutory language could be read as meaning that the IEP need not be established until the school year has begun, the regulations make clear that the IEP must be established before the school year, even if that requires meeting with the child and the parents during the summer. The regulations provide that the IEP must "[b]e in effect before special education and related services are provided to a child." 34 C.F.R. § 300.342(b)(1). This regulation also states that

"it is expected that a handicapped child's individualized education program (IEP)

will be implemented immediately following the meetings [to establish an IEP] under § 300.343. An exception to this would be (1) when the meetings occur during the summer or a vacation period...."

*Id.* (Comment). Moreover, § 300.343 also contemplates summer meetings: "In order to have IEPs in effect by the dates in § 300.342 [the beginning of each school year], agencies could hold meetings at the end of the school year or during the summer preceding those dates." § 300.343 (Comment).

Thus, the IDEA required the school system to establish Myles's actual IEP, not a preparatory IEP, before August 28, when the school year began, even if that required meeting with Myles as well as with his parents over the summer. Similarly, the school system violated the requirement that a meeting to develop an actual, rather than preparatory, IEP "be held within thirty calendar days of a determination that the child needs special education and related services." 34 C.F.R. § 300.343(c). Even using the July 29 date, the August 9 preparatory IEP meeting did not suffice. The actual IEP meeting did not take place until September 9, more than 30 days after July 29.

Nevertheless, the effect of these two violations of the IDEA's time requirements is that for the first two weeks of school, Myles did not have the benefit of his actual IEP, though the preparatory IEP was used. Myles has not shown any harm from this brief two-week delay. Certainly, Myles received a substantial educational benefit from the preparatory IEP and his parents fully participated in the development of both the preparatory and actual IEP. *See Doe v. Alabama State Dep't of Educ.*, 915 F.2d at 663 (relief not required where no harm from procedural violation and parents participated fully). In fact, Myles's father testified that he "really didn't have a problem with it being an interim individualized education program because [he] could understand not having ever worked with the child before."

Even technical violations of the IDEA will not ordinarily be excused. In this situation, however, the school system made a good faith effort to follow the regulations. In the future, when students enter the program for the first time, the school system must hold meetings to develop an actual IEP and establish the actual IEP before the school year begins, even if that requires meeting with the child and the parents during the summer. In addition, for students who are already in the program, the IEP must be revised before the school year begins, even if that requires meeting over the summer when the revision was not accomplished at the end of the previous school year. *See* 34 C.F.R. § 300.343(d) & Comment.

■ *Physical Education.* Myles's parents contend that the school system has failed to develop a specially designed (adaptive) physical education instruction program to meet Myles's unique needs in violation of 20 U.S.C.A. § 1401(16) and 34 C.F.R. § 300.-14(a)(1). Section 1401(16) provides that the "term 'special education' means specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a child with a disability, including ... instruction in physical education."

The hearing officer found that another regulation, 34 C.F.R. § 300.307, provides that physical education must be specifically designed only if necessary and that Myles's classroom teacher, physical therapist, and occupational therapist found that adaptive physical education for Myles was unnecessary. His physical therapist and classroom teacher stated that anything that Myles would receive in adaptive physical education was addressed by the physical therapy, physical education, and occupational therapy that he did receive in class. [Apr. 8, R164] Myles needed development of his gross motor skills and his fine motor skills; attention to these skills was provided in his program. In addition, the IEP Committee felt that his motor needs would best be met by people who were more familiar with him and more specifically trained to handle his individual needs. [Apr. 8, R164]

Myles's parents argue that this position merely represents the school system's opinion that it is unnecessary to provide specially designed instruction in physical education to multi-handicapped preschoolers. They point out that the Montgomery School System has

no physical education classes for special education preschoolers. Although the school system's lack of separate physical education classes for special education preschoolers suggests the possibility that the school system may not be acting in good faith, separate physical education classes for Myles are not required. The IDEA contemplates that the determination whether special physical education is necessary will be determined by the IEP. *See* 34 C.F.R. § 300.307(c). Myles's IEP Committee determined that separate physical education classes for him were not necessary or appropriate because his physical education needs were met through his classroom education and physical and occupational therapy.

The court agrees with the hearing officer and finds that the IEP Committee's decision was made in good faith, was rational, and did not deny Myles an educational benefit. Furthermore, Myles's parents' request is for a special physical education class for him and children similar to him. They have not shown, however, what benefits Myles would obtain in a group setting that he does not receive in an individual setting. In fact, the evidence suggests that due to Myles's low functioning ability, individual physical education is most suited to Myles's special needs.

■ *Notice.* Myles's parents assert that the school system violated 20 U.S.C.A. § 1415(b)(1)(C)(ii) and 34 C.F.R. § 300.504(a)(2) by failing to provide them with notices of refusal to make changes in Myles's IEP that they had requested. Ralph Griswold, Director of Special Education, testified that it was not necessary to send written notices to Myles's parents of refusals to change IEP provisions because the refusals would be reflected in the IEP itself. [Apr. 8, R36] The IDEA, however, requires the school system to state in writing why it refuses to take a requested action, any options the school system considered and why those options were rejected. 34 C.F.R. § 300.505. According to Myles's parents, the failure to provide written notification denied them a procedural safeguard and a due process right guaranteed to them by the IDEA.

Although the hearing officer found that the school system had failed to respond in writing to a proposed change in only one instance, the court finds that written notification was not provided on a number of occasions. On September 9, 1991, the school system discussed Myles's IEP with Myles's parents, who suggested a number of changes which were discussed at that meeting. They were not provided with a written IEP at that time. The IEP Committee met again to consider the other changes. On September 27, the formal IEP was provided to Myles's parents. No written notice was given to explain why some changes were not made. Myles's classroom teacher testified that many of the proposed changes had been discussed at the September 9 meeting. [Apr. 8, R106]

On October 2, 1991, Myles's parents requested in writing six specific changes to the IEP. Four of the requested changes were adopted and noted on a revised IEP, which was provided to Myles's father. He signed and returned the revised IEP on November 3. The two other requested changes, for extended school year services and aquatic activities, were discussed with Myles's father, including the reasons for rejecting the requests. The administrator of Myles's school responded to the aquatic request in writing on October 10 explaining why the school could not provide the swimming program as requested. [Apr. 8, R107] A separate request for adaptive physical education was discussed at a September 19 IEP meeting, which Myles's mother attended. The second and third time the extended school year request was made, the school system addressed it in writing.

The hearing officer determined that the school system did not violate 34 C.F.R. §§ 300.504 and 300.505 by not responding in writing to the October 2 request for extended year services and adaptive physical education. He found that those provisions do not apply when the parents have consented to an IEP for a specified school year and then request changes in the IEP. Myles's parents maintain that the language of the provisions does not support the hearing officer's interpretation. The court agrees.

20 U.S.C.A. § 1415(b)(1)(C)(ii) clearly states that the "procedures required by this

section shall include ... (C) written prior notice to the parents or guardian of the child whenever such agency or unit ... (ii) refuses to initiate or change, the identification, evaluation, or educational placement of the child...." In addition, Comment 1 to 34 C.F.R. § 300.504 states that "[a]ny changes in a child's special education program, after the initial placement, are not subject to parental consent under Part B, but are subject to the prior notice requirement in paragraph (a)." Furthermore, § 300.500(c) provides that "the granting of consent is voluntary on the part of the parent and may be revoked at any time." Thus, the provisions require notice of a refusal to change an IEP, even if the parents had previously consented to the IEP. 34 C.F.R. § 300.505 requires that the notice must be written and must include an explanation of why the agency refuses to take the action. The oral notification made by the school system was not sufficient.

Nevertheless, Myles's parents admit that they received actual notification of the school system's refusal to change the IEP and also received oral explanations for the refusals. Myles's parents have not shown any harm or any denial of an educational benefit to Myles due to the lack of written notice. Moreover, Myles's parents participated fully and effectively in the development and revision of Myles's IEP. The Eleventh Circuit has stated that "full parental involvement in the handicapped child's education is the purpose of many of the EHA's [now IDEA] procedural requirements." *Doe v. Alabama State Dep't of Educ.*, 915 F.2d at 661. In *Doe,* the court found that relief was not warranted because the notice deficiencies "had no impact on the Does' full and effective participation in the IEP process and because the purpose of the procedural requirement was fully realized in this case." *Id.* at 662. Although relief might be warranted if the school system acted in bad faith, failed to give an explanation for its actions, or repeatedly failed to give written notice, such was not the case here. Accordingly, no relief for the school system's past notice deficiencies is warranted.

Prospective relief, however, is warranted to ensure that the school system gives writ-

ten notice and explanations of refusals to change IEP provisions, even if oral explanations are provided. This prospective relief is necessary because the school system's position, as expressed by Ralph Griswold, has been that a written notice and explanation is unnecessary because requested changes that are not made will simply not show up on the written IEP. This type of notice does not meet the IDEA's requirements.

■ *Independent Educational Evaluation.* Myles's parents contend that the school system violated 20 U.S.C.A. § 1415(b)(1)(A) and 34 C.F.R. § 300.503 by failing to provide Myles with an independent educational evaluation of his need for extended school year services. Citing 34 C.F.R. § 300.500, the hearing officer seemed to suggest that an independent evaluation at public expense was not available to determine eligibility for extended school year services. This conclusion is incorrect. Section 300.500 defines "evaluation" as including procedures used to determine "the nature and extent of special education and related services." A determination as to extended school year services clearly falls within this definition.

The hearing officer found that Myles's parents filed their due process hearing request before the school system responded to their request for extended school year services or for an independent evaluation. Myles's parents requested extended school year services as early as the first IEP meeting on August 9, 1991. On October 2, Myles's parents put their request for extended school year services in writing. On December 12, Myles's parents requested in writing that the IEP committee reach a decision as to extended school year services by February 28, 1992. [Apr. 8, R42] A week later, Griswold wrote back that extended school year services would be addressed at a meeting in late January. [PX10] Although extended school year services were discussed at that meeting, Griswold told Myles's parents that a determination as to extended school year services was not appropriate at that time because enough data had not been collected. [Apr. 8, R45–46] In response to Myles's parents' request for a decision at that time, the school system responded that if it had to make a

decision then, it would not grant extended school year services. [Apr. 8, R45]

On February 20, 1992, Myles's parents wrote to Griswold, stating that they disagreed with the committee's decision to refuse extended school year services. [Apr. 8, R47; PX 11] They also made a formal request for an independent educational evaluation of Myles's need for extended school year services. [Id.] On March 4, Griswold responded that the IEP committee had not refused the request for extended school year services but had decided to make a determination following the spring holidays, the week of April 6. [PX 11] Griswold also stated that the school system saw no need for an independent evaluation because the school system's process was adequate. Myles's parents requested a due process hearing on March 4.

The school system never formally rejected the request for extended school year services or for an independent evaluation. At some point, however, a refusal to make a determination as to extended school year services becomes a de facto refusal to offer those services. Myles's father testified that a decision as to extended school year services must be made in advance of the summer in order to make private arrangements if extended school year services are denied. [Apr. 9, R66] In addition, advance notice is necessary to obtain an independent evaluation. The question thus becomes whether the school system appropriately waited until after the spring holidays to determine the need for extended school year services. As to this issue, Myles's parents argue that by failing to make a determination as to extended school year services until April 27, 1992, the school system deprived Myles of due process of law.

Although the school system waited until near the end of the school year, it did not deprive Myles and his parents of due process. The school system reasonably waited until after the spring holiday in order to be able to judge whether Myles had regressed. Had Myles already been in the school system, waiting until the spring holiday likely would have been unexcusable. However, the school system had no other basis for making a determination as to regression other than

evaluating Myles after the only substantial breaks in the school year, the winter and spring vacations. The court notes that, even though the hearing officer and this court found the school system's actions reasonable, Myles's parents appropriately requested a due process hearing. Had they waited any longer, they would not have been able to have a due process hearing officer determine whether the school system's decision to wait was appropriate.

Although the school system had not made a formal evaluation of Myles's need for extended school year services, the hearing officer treated the testimony at the due process hearing as a decision that such services were not necessary. The hearing officer also found that the procedures that the school system had been using in evaluating Myles for extended school year services were adequate. Thus, Myles's parents received a due process review of the need for extended school year services and the need for an independent evaluation, although the posture of the review was somewhat different than contemplated in the federal regulations. 34 C.F.R. § 300.503 provides that parents have the right to an independent evaluation if they disagree with the public agency's evaluation. Griswold admitted that, once a parent files a formal request for an independent evaluation, the school system has the burden to ask for a due process hearing to show that the school system's evaluation is adequate. [Apr. 8, R50] Thus, the school system, rather than Myles's parents, should have sought a due process hearing as to the need for an independent evaluation. Nevertheless, Myles's parents received a due process review of all of the issues that they raised.

■ Finally, then, the court must determine whether the hearing officer properly found that the school system's evaluation was appropriate. The court agrees with the hearing officer's findings. Griswold testified that he had been to workshops on determining the need for extended school year service and brought back literature for in-service training of teachers. [Apr. 8, R51] Myles's classroom teacher received this training. Griswold also stated that no standardized test exists for assessing extended school year

services. [Apr. 8, R 53] Instead, data such as daily observation and reviewing the goals of the IEP are used to determine whether significant regression has occurred and whether the student is able to recoup lost abilities within a reasonable length of time. Myles's classroom teacher testified that she used a technical assistance paper provided by the State Board of Education in preparing to make a determination as to extended school year services. In addition, at a meeting attended by Myles's parents, the IEP Committee made a list of critical skills to use in determining the need for extended school year services. [Apr. 8, R129] Myles's teacher also testified that no standardized assessment could measure Myles's critical skills, particularly with a child as low functioning as Myles. [Apr. 8, R141–42] Thus, the school system tested Myles for extended school year services in the most appropriate way, considering his condition.

*Extended School Year Services.* The school system argues that the hearing officer erroneously ordered greater extended school year services than were appropriate to prevent significant regression of Myles's skills. Apparently, the school system did not file any formal appeal of this issue and did not include it in the parties' joint statement of issues submitted to the court. Nevertheless, the court will address the issue.

The school system claims that the hearing officer ignored the determination of Myles's teachers and therapists, who saw no significant regression after the winter and spring breaks, and therefore no need for extended school year services. At the due process hearing, the school system's experts recommended only one 30–minute session a month for physical therapy. The hearing officer ordered physical therapy every week throughout the summer.

■ The hearing officer found that it is clear that Myles requires physical therapy on a year-round basis and that physical therapy was necessary to maintain Myles's gross motor skills, which the IEP had identified as a critical skill for Myles. The school system seems to concede this point, but suggests that the parents could have provided physical therapy themselves. The ability of Myles's

parents to provide some services does not excuse the school system from its responsibilities to provide special educational or related services that a child requires. In addition, Myles's physical therapist testified that a physical therapist, as opposed to a family member, was necessary for Myles to maintain his upper-body strength. [Apr. 8, R302] Accordingly, the hearing officer's finding concerning physical therapy was correct.

■ *1992 Summer Period.* Myles's parents contend that the school system violated the hearing officer's order and Myles's IEP concerning extended school year services. The hearing officer ordered the school system to provide Myles with physical therapy on a 30–minute basis once a week for the summer period, and to continue to provide training materials to Myles's parents in the form of video tapes, written material or actual consultation so that they could provide home instruction to Myles. Upon a direction from the hearing officer to evaluate Myles for other extended school year services, Myles's IEP was amended to include three 30–minute occupational therapy sessions for Myles over the summer. Myles's parents have testified that during the summer: the school system failed to provide training materials to them in any form, the physical therapist failed to come one week, and the occupational therapist failed to come one week. Myles's father has testified in an affidavit that during the summer Myles significantly regressed in the areas of critical skills involving feeding and that as of November, 1992, Myles had not regained his feeding skills.

The school system responds that physical therapy was not provided one week because the therapist was suffering from bronchitis and informed Myles's mother of that fact. [Faith Anthony Dep. 8–9] The therapist has testified that she offered to schedule a make-up session but that she and Myles's parents realized school was going to start the next week and all agreed that the therapy was over. [*Id.* at 10] Myles's occupational therapist saw Myles two times for 45 minutes each time. At the end of the second session, she did not have time to schedule the third session because the physical therapist had ar-

rived. The occupational therapist thought, however, that she had completed her responsibilities of monitoring Myles over the summer. Myles's parents did not attempt to contact the occupational therapist to schedule a third session. The school system points out that the overall time mandated in the IEP, 90 minutes, was met, but in two sessions rather than three.

Myles's parents do not dispute these assertions. Thus, the two missed sessions were not the result of an attempt to avoid the instructions of the hearing officer or the IEP. Rather, the missed occupational therapy session was an oversight which Myles' parents did not attempt to correct and the physical therapy session was not made up with the approval of Myles's parents. Thus, although the school system technically violated the IEP's requirement of three occupational therapy sessions, the violation was not done in bad faith and was de minimis.

■ As to training materials, Myles's speech therapist has testified that at the end of the school year, she sent Myles's parents written home programming activities and a video of her working with Myles. [Anita Shook Dep. 8–9] Myles's physical therapist has testified that she also sent home a video at the end of the school year. [Mary Hobson Dep. 11] Myles's parents are correct in asserting that they received no training materials *during* the summer. However, they did receive materials at the beginning of the summer for use during the summer. In addition, the summer physical therapist instructed Myles's parents in the techniques that she used. [Faith Anthony Dep. 12] Thus, Myles's parents were able to provide informed home instruction to Myles in areas that involved his critical skills.

*Related Services.* Myles's parents maintain that the school system has violated 20 U.S.C.A. § 1401(a)(20)(C) and 34 C.F.R. § 300.346(c) by failing to follow and implement specific special educational and related services contained in Myles's IEP and that this failure effectively denied Myles a free appropriate public education. Their contention that the school system failed to provide related services as part of extended school year services is refuted above. Myles's par-

ents also claim that the school system "admitted" that it was unable to provide all of the parent training materials required by the IEP. One of Myles's classroom teachers, however, merely stated that a video for December 1991 was not provided because she felt it would be redundant and not useful. [Sharon Tomlinson, Apr. 8, R113]

■ In addition, Myles's parents claim that Myles was not provided occupational therapy during the last two weeks of September 1991, and the month of October 1991, on the twice weekly basis set out in the IEP. The school system admits that Myles was seen by an occupational therapist only twice in September and only once in October. Nevertheless, the hearing officer found that Myles received adequate special educational and related services in view of the identified critical skills applicable to Myles. The lack of full compliance with occupational therapy requirements in September and October, however, was not done out of bad faith. The occupational therapist's contract ended in September and there was some delay until a new therapist arrived. Griswold testified that it was extremely difficult to find an occupational therapist due to the lack of available people. [Apr. 8, R56] While this situation perhaps could have been avoided by better planning, the missed occupational therapy sessions do not amount to a denial of a free appropriate public education. The situation was only temporary and some occupational therapy was provided. Myles has still received an educational benefit from his occupational therapy throughout the year despite the missed sessions. After October, Myles was seen twice weekly by either an occupational therapist or a certified occupational therapist assistant.

■ *1992–93 School Year.* Myles's parents also contend that the school system violated the IEP by failing to provide training materials to them during the 1992–93 school year. The court finds that the school system complied with the IEP, which requires that initial, midyear, and endyear training materials be provided. In September 1992, Myles's physical therapist sent Myles's parents a home training videotape

[Mary Hobson Dep. 11–12], and Myles's speech therapist provided Myles's parents with written home training materials. [Anita Shook Dep. 10–11] Myles's classroom teacher provided written suggestions, oral consultations, and two textbooks to Myles's parents in September and October 1992. [James Clark Waggoner Dep. 7–9] Myles's parents have both come to the classroom to learn Myles's classroom program. [Waggoner Dep. 8] Thus, as of the date that the parties' evidence was submitted to the court, the school system had provided adequate training materials to Myles's parents.

■ *Length of School Day.* Myles's parents claim that the school system violated the Alabama Pre–School Special Education Act and its implementing rules by failing to operate Myles's special education program for at least the length of the regular scholastic day. The regular scholastic day for children in the elementary school and older is from 8:00 A.M. to 3:00 P.M. The pre-school program at Myles's school operated from 8:45 A.M. to 1:45 P.M. Alabama Administrative Code § 290–080–090–.11(23)(a) provides that the

> "school day for special education programs are to be in operation ... the length of the regular school day. However, students in these programs must be scheduled according to their Individualized Education Program which may recommend less than a full day attendance."

As an initial matter, three and four year olds in Alabama not in special education do not have a "regular school day." Therefore, the Alabama Administrative Code does not require that three and four-year-old special education students, such as Myles, have a school day from 8:00 until 3:00. Moreover, as allowed by the Code, Myles's IEP designated less than a full day attendance. The hearing officer found that the time period in Myles's IEP was adequate for his needs as he tires easily from training and frequently falls asleep. The evidence demonstrated that increasing his school hours would probably be of no benefit to him.

Other circuit courts have held that an abbreviated school day is valid under the IDEA if appropriately decided in the child's IEP. *See, e.g., Christopher M. v. Corpus Christi Ind. School Dist.*, 933 F.2d 1285, 1290–91 (5th Cir.1991) (citing cases). As to Myles's individual case, Myles's teacher testified that he was often asleep at the end of the school day in her class. Thus, the school system did not violate the Alabama Code or the IDEA by offering a shorter school day.

*Attorneys' Fees.* Myles's parents request reasonable attorneys' fees pursuant to 42 U.S.C.A. § 1988 and 20 U.S.C.A. § 1415(e)(4)(B). They have not specified whether they are requesting attorneys' fees for the action before this court or for the due process hearing or for both. In light of these facts, the court will allow Myles's parents a reasonable time to file a request for attorneys' fees and costs, specifying which action or actions the fees concern and on which issues they are the prevailing party.

## III. CONCLUSION

The court admires the persistence and energy that Myles's parents have devoted to better the life and the education of their son. The action they have brought is a good faith attempt to seek all available means of ensuring that Myles receives a quality education. Unfortunately, the school system does not have all the resources that Myles's parents requested. The IDEA, while ensuring that handicapped children receive an appropriate education, does not require that a school system provide the maximum benefits that they seek. Thus, the court appreciates the concern expressed by Myles's parents but also finds that the school system has substantially complied with the provisions of the IDEA. The court notes that Myles's parents were correct in asserting that the school system did not technically comply with a number of IDEA provisions. As these failures to comply were not done in bad faith, still allowed Myles to benefit educationally, and still allowed Myles's parents to participate fully and effectively in Myles's education, no relief is warranted for these past violations. However, prospective relief is warranted in part.

An appropriate judgment will be entered.

**1562**

## JUDGMENT

In accordance the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That it is the DECLARATION of the court that defendants Montgomery County Board of Education, Thomas A. Bobo, Ralph Griswold, and Ann Griswold are to provide written notice of refusal to change any provision of an IEP; and

(2) That all other relief sought by the plaintiffs be and it is denied.

It is further ORDERED that plaintiffs are allowed until March 30, 1993, to file a request for attorney's fees and expenses.

It is further ORDERED that costs be and they are hereby taxed against the defendants, for which execution may issue.