

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-21-2002

# Tallman v. Barnegat Bd of Ed

Precedential or Non-Precedential: Non-Precedential

Docket No. 01-2423

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Tallman v. Barnegat Bd of Ed" (2002). *2002 Decisions.* Paper 529.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/529

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 01-2423

_____

JANE TALLMAN; RICHARD TALLMAN, individually, and as
Administrators ad Prosequendum on behalf of Jason Michael
Tallman, deceased

v.

BARNEGAT BOARD OF EDUCATION; THE STATE OF NEW JERSEY;
THE STATE OF NEW JERSEY DEPARTMENT OF EDUCATION,
Division of Special Education, Division of Compliance,
Bureau of Controversies and Deputies; STATE OF NEW JERSEY
DEPARTMENT OF HUMAN SERVICES, DIVISION OF YOUTH AND FAMILY
SERVICES; JILL STANICK; ANNE G. STERNER; JOAN HELEINE; GAYLE
GUNNING; JEFFREY OSOWSKI, DR.; ROBERT L. HORBERT, DR.;
CHERYL L. GOLDEN

v.

BARNEGAT BOARD OF EDUCATION; JILL STANICK; ANNE G. STERNER;
JOAN HELEINE; GAYLE GUNNING; ROBERT L. HORBERT, DR.,

Third-Party Plaintiffs

v.

KIDSPEACE CORP. d/b/a WILEY HOUSE; DEAN SINE,

Third-Party Defendants

(District Court No. 95-cv-02351)

JANE TALLMAN; RICHARD TALLMAN, individually, and as
Administrators as Prosequendum on behalf of Jason
Michael Tallman, deceased
v.

BARNEGAT BOARD OF EDUCATION; THE STATE OF NEW JERSEY;
THE STATE OF NEW JERSEY DEPARTMENT OF EDUCATION, Division/
Office of Special Education, Division of Compliance, Bureau
of Controversies and Disputes; STATE OF NEW JERSEY OFFICE
OF ADMINISTRATIVE LAW; JILL STANICK; ANNE G. STERNER; JOAN
HELEINE; GAYLE GUNNING; ROBERT L. HORBERT, DR.; CHERYL L.
GOLDEN; DAVIS C. HESPE, Commissioner of the Department of
Education; JEFFREY OSOWSKI, Assistant Commissioner Division
of Information and Management Services

v.

BARNEGAT BOARD OF EDUCATION; JILL STANICK; ANNE G. STERNER;
JOAN HELEINE; GAYLE GUNNING; ROBERT L. HORBERT, DR.,

Third-Party Plaintiffs
v.

DEAN SINE; KIDSPEACE CORPORATION d/b/a WILEY HOUSE,

Third-Party Defendants

(District Court No. 00-cv-01175)

JANE TALLMAN; RICHARD TALLMAN, individually, and as
Administrators as Prosequendum on behalf of Jason
Michael Tallman, deceased,

Appellants

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

Dist. Court Nos. 95-CV-02351 and 00-CV-01175 (consolidated)
District Judge: Anne E. Thompson

———————————

Argued March 8, 2002

Before: BECKER, Chief Judge, and ALITO and RENDELL, Circuit Judges.

(Opinion Filed: August 21, 2002)

S. ROBERT PRINCIOTTO (Argued)
Marcus & Levy
80 Broadway, 2nd Floor
Elmwood Park, NJ 07407

*Counsel for Appellants*

ROBERT A. MORLEY (Argued)
Law Office of Stephen E. Gertler
1350 Campus Parkway
Wall, NJ 07719

*Counsel for Appellees Barnegat
Board of Education, et al.*

TODD J. SCHWARTZ
HOWARD J. McCOACH (Argued)
Office of Attorney General
of New Jersey
25 Market Street
Trenton, NJ 08625

*Counsel for Appellees State of
New Jersey, et al.*

---

OPINION OF THE COURT

---

PER CURIAM:

Richard and Jane Tallman, parents of the deceased Jason Tallman, take this appeal

from the District Court's grant of summary judgment against them on their damages claim

under 42 U.S.C. § 1983 for violations of the Individuals with Disabilities Education Act, 20

U.S.C. § 1400 et seq. ("IDEA"). The Tallmans' son, Jason, died after being restrained at a

residential school at which he had been placed under the IDEA, and the Tallmans contend that violations of the IDEA and implementing regulations were proximate causes of his death. Jason's death was a tragedy, but we are compelled to conclude that summary judgment was proper.

## I.

## A.

Jason Tallman, then 12 years old, died in May 1993 as a result of injuries suffered while a student at Wiley House, a highly structured residential school in Pennsylvania for troubled youth. Although blessed with a high I.Q., Jason had a long history of disruptive behavior and had been diagnosed as suffering from hyperactivity, dysgraphia, metal toxicity, and emotional disturbance.

Jason attended a public elementary school in Barnegat, New Jersey, through the third grade, but he exhibited behavioral problems. In the fall of 1990, Jason's parents enrolled him in a Catholic school in Toms River, where his behavior was at times highly inappropriate and threatening. He composed a rhyme that culminated in blowing his teacher's head off with a bazooka, and he threatened to kill his teacher and bomb the school. See App. 340. After Christmas, he was asked to leave the school and was again enrolled in the Barnegat public school system, where his behavioral problems, including running away and threatening the vice-principal, continued.. See App. 365-70, 845-48. Jason was evaluated, and during the following summer it was recommended to the Tallmans that they consider a classification of emotionally disturbed.

4

Instead, the Tallmans again removed Jason from the Barnegat school system and enrolled him in the fall of 1991 in Admiral Farragut Academy in Pine Beach, New Jersey. In January 1992, he was asked to leave Admiral Farragut.

The Tallman family then admitted themselves for treatment at the Philaldelphia Guidance Center. App. 380. During his first three days at the Center, Jason's medication was changed and, according to his mother, he became "[e]xtremely wild, totally out of control." App. 383. He was then admitted to the Horsham Clinic. See id. at 384. There, according to a physician' report, Jason "was extremely uncooperative with the examiner" and "was often aggressive with his mother and required her to keep him in constant restraint. He kicked and hit her several times, and at one point tried to trash [the doctor's] office" and "caused significant damage." Id. at 570. At one point, Jason, who was then 10 years old, "had to be escorted out of the office by security and mental health technicians because he was extremely aggressive and dangerous." Id.

In March 1992, the Tallmans once again enrolled Jason in the Barnegat public school system, and he was classified as emotionally disturbed. He was assigned temporarily to home instruction, while the Tallmans and staff of the Barnegat Board of Education and New Jersey's Division of Youth and Family Services ("DYFS") began a largely cooperative search for a school outside the Barnegat district where Jason could be placed at public expense. At first, they applied only to day schools. Only one day school accepted Jason's application, but the Tallmans found that school, Archway, unacceptable, primarily because it "did not take in the educational, the giftedness along with disabilities."

5

App. 392. The search then widened to include in-state residential schools, but Jason was rejected from the all those to which his application was sent.

The search was expanded further to include out-of-state residential institutions, and this time the Wiley House in Pennsylvania offered to take Jason. Contemporaneously, the Tallmans, acting independently, secured a place for Jason at the Grove School in Connecticut. The Barnegat team visited both schools and decided that Wiley House was "superior." App. at 998. The Grove School soon rescinded its offer to Jason, after a DYFS staffer provided the school with records from the Horsham Clinic suggesting (incorrectly, according to the Tallmans) that Jason had started fires. Thus, after the Tallmans and the Barnegat defendants together undertook three rounds of an ever-widening search, Wiley House was the only residential school still willing to take Jason.

The Tallmans initially resisted placing Jason at Wiley House, contending that the Grove School better served Jason's needs because its structure was less rigid and its environment was more suited for gifted students. Because of this disagreement over which school was more appropriate, Mrs. Tallman did not sign the Individual Education Program[1] ("IEP") that she and the Barnegat Child Study Team had jointly drafted. The Tallmans requested a due process hearing, and one was scheduled before Administrative Law Judge Joseph Martone ("the ALJ"). Before the hearing, however, the parties entered into a

---

[1] An IEP is a detailed instruction plan developed for each child classified as disabled. The basic components of the IEP are mandated by § 1414(d) of the IDEA. State regulations make further specifications.

6

settlement on January 28, 1993, and on February 1 the ALJ approved the settlement. Under this settlement, Jason would enter Wiley House, but the question whether permanent placement there was appropriate would be postponed until after Jason was admitted and evaluated at Wiley House. Thus, Jason finally entered Wiley House on May 11, 1993, but without a completed IEP. The next day, a staff member at Wiley House, while breaking up a dispute between Jason and another student, physically restrained and fatally injured Jason. Jason died within a day.

B.

The procedural history of this litigation begins in 1995, when the Tallmans, proceeding in their individual capacities and as administrators ad prosequendum of Jason's estate, filed a complaint for money damages pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq., Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, the Civil Rights Act, 42 U.S.C. § 1983, the Handicapped Children's Protection Act of 1986 (HCPA), 20 U.S.C. § 1415(e), and the Family Education Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g. See App. at 25. The complaint named as defendants the State of New Jersey, its Departments of Education (DOE) and Human Services (DHS), Jason's DYFS case worker (Cheryl Golden), and a DOE representative (Jeffrey Osowski). Also named were the Barnegat Board of Education, Jason's Child Study Team (Jill Stanick, Anne Sterner, and Joan Heleine), the director of special education (Gayle Gunning), and Barnegat's superintendent (Robert Horbelt). (We will refer to this latter group of defendants collectively as "the Barnegat defendants.")

In January 1996, the District Court dismissed some of the Tallmans' claims, viz., their § 1983 claims against the State of New Jersey and its departments, their FERPA claims, and their direct claims under the IDEA against DHS and Golden. In September 1997, the District Court granted summary judgment in favor of the State, DOE, DHS, and Cheryl Golden on the remaining claims against them. The Court also granted summary judgment in favor of the Barnegat defendants on the claims under the Rehabilitation Act and FERPA. In March 1998, the District Court "remanded" the case to ALJ Martone for an evidentiary hearing to determine whether the Barnegat defendants had violated the IDEA.

The ALJ expressed doubt about his jurisdiction to conduct a hearing and make determinations in this action, but he proceeded in accordance with the District Court's directions and considered eight violations of the IDEA alleged by the Tallmans: (1) "exploring day placements and placing [Jason] on home instruction without the benefit of an IEP," (2) "failing to provide [Jason] with a continuum of alternative placements," (3) "placing [Jason] on home instruction for the 1992-93 school year, this being the most restrictive placement," (4) "placing [Jason] in [a] non-approved placement," (5) "failing to recognize the unsegregability of [Jason's] disabilities," (6) violating the child find requirements," (7) "failing to assess all areas of suspected disability," and (8) failing to include the parents as joint and equal participants in the IEP process." App. 127. The ALJ rejected all but two of these alleged violations.

The first violation found by the ALJ was that the Barnegat defendants had violated the IDEA by placing Jason on home instruction without the benefit of an IEP during the

8

period from March to May of 1992 (one year before his death). The Barnegat defendants contended that an initial IEP had probably been prepared in March before the period in question, but Mrs. Tallman disagreed, and the earliest IEP produced by the defendants was prepared in May. The ALJ accordingly found that the Barnegat defendants had "violated the IDEA by placing [Jason] on home instruction wihout the benefit of an IEP from March until May 1992." Id at 130.

The second violation found by the ALJ was that the Barnegat defendants made "the determination to place [Jason] in either a day placement, or subsequently, in a residential placement, without the benefit of an IEP." App. 130. He credited the testimony of the director of the child study team that the procedure in cases such as Jason's was to find a placement and prepare a conforming IEP later, and he concluded that this clearly violated the IDEA and implementing regulations. Id.

The ALJ went on to observe that the entire proceeding should be dismissed because the parties had settled all IDEA issues at the time of Jason's placement at Wiley House. "At that time," the ALJ wrote, "it was agreed that [Jason] would become a resident of Wiley House based on the agreement that Wiley House was a more appropriate placement tha[n] home instruction, and that there would be an independent evaluation of [Jason]. At that time, petitioners had the opportunity to pursue any claims they may have had that the [district] violated the procedural requirements of the IDEA [in any of the ways alleged]' but that they "chose not to do so" and instead to settle the matter." Id.

Apparently as a means to appeal the ALJ's decision, the Tallmans filed a second

9

complaint in federal court in March 2000. This second action made virtually identical claims as the 1995 action. It asserted violations of the IDEA, the Rehabilitation Act, HCPA, FERPA, and § 1983. However, instead of naming the DHS or DYFS as defendants, the new complaint named the State of New Jersey Office of Administrative Law (OAL) and the Commissioner of the DOE.

In November 2000, the District Court reinstated the 1995 action and dismissed most of the claims in the 2000 complaint under *res judicata*. The Court dismissed the claims against the OAL on the ground that the complaint failed to state a claim on which relief could be granted and on the ground of judicial immunity. App. 144-47. Finally, in May 2001, the Court granted the Barnegat defendants' motion for summary judgment on the claims asserted in the 1995 complaint. The Court accepted the ALJ's findings that there had not been strict compliance with the IDEA in two respects, but the Court held that these were "technical" and not "actual" violations. Id. at 158. In addition, the court found that "the technical violations by the Barnegat defendants" did not constitute a proximate cause of Jason's death. Id. The Court also granted Wiley House's motion for summary judgment on the Barnegat defendants' claim for indemnification and contribution. The Tallmans then took this appeal.

## II.

We first address the question whether the District Court erred in 1998 by remanding the case to the ALJ for an evidentiary hearing on whether the defendants had violated the IDEA. Most IDEA actions do not seek damages and are filed in federal district court only

10

after administrative proceedings that often result in the creation of an exhaustive administrative record. The remand ordered by the District Court sought to place this damages action in the same procedural posture as conventional IDEA actions, and we therefore have no difficulty seeing why the District Court found this procedure to be attractive. In addition, the District Court observed that neither party had objected to the remand.

The Tallmans now argue, however, that this procedure constituted legal error for two reasons -- because the ALJ lacked jurisdiction and because they were entitled to a jury trial on their damages claims. The Tallmans take the position that the District Court's error in remanding the case to the ALJ should invalidate the District Court's subsequent reliance on the ALJ's findings that the only IDEA violations were the two mentioned above.

We are inclined to agree that "remand" to the ALJ was improper. Neither the District Court nor the defendants have offered a persuasive legal basis for this procedure. We also note that the administrative remedial scheme could not provide the damages sought by the Tallmans. See W.B. v. Matula, 67 F.3d 484, 495 (3d Cir. 1995) ("where the relief sought in a civil action is not available in an IDEA administrative proceeding, recourse to such proceedings would be futile").

However, we see no reason why we cannot view the testimony of the various witnesses at the hearing before the ALJ as the equivalent of depositions submitted in support of a motion for summary judgment under Fed. R. Civ. P. 56(e). At oral argument, counsel for the Tallmans conceded he had no objection to our taking this view of the

11

testimony before the ALJ.

III.

We now turn to the central issue in this appeal: whether the record is sufficient to defeat summary judgment on the Tallmans' IDEA claims for damages. Under the IDEA, states receive federal funds for special education programs on the condition that they implement policies to assure a "free appropriate public education" for all of its disabled children. 20 U.S.C. § 1412(a)(1)(a). New Jersey fulfills its IDEA obligations through a complex statutory and regulatory scheme currently codified at N.J.S.A. § 18A:46-1 et seq. and N.J.A.C. § 6A:14-1 et seq. (formerly codified at N.J.A.C. § 6:28-1 et seq.).

The United States Supreme Court has summarized the statutory definition of a "free appropriate public education" as consisting of "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." Board of Ed. v. Rowley, 458 U.S. 176, 188-89 (1982); see also 20 U.S.C. § 1401. In Ridgewood Board of Ed. v. N.E., 172 F.3d 238 (3d Cir. 1999), we elaborated that an IEP, in order to meet this standard, must provide "significant learning" and confer "meaningful benefit." Id. at 247. While an IEP need not maximize the potential of a disabled child, the benefit must be more than "trivial." Id. at 247 (citing Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171 (3d Cir. 1988)). Our Court, unlike some other courts of appeals,[2] has held that a claim

---

[2] See, e.g., Hall v. Knott County Bd. of Educ., 941 F.2d 402, 407 (6th Cir. 1991); Miener v. State of Missouri, 800 F.2d 749, 753-755 (8th Cir. 1986).

12

for a violation of the IDEA may be brought under § 1983.  See W.B. v. Matula, 67 F.3d 484 (3d Cir. 1995).

As previously noted, the District Court accepted the ALJ's factual finding that defendants violated the IDEA when they placed Jason on home instruction without the benefit of an IEP from March until May 1992 and when they made the determination to place him in either a day or residential placement without the benefit of an IEP.  App. 130. Nevertheless, the District Court held that these violations were "technical" rather than "substantive" and thus not "actual violation[s] of IDEA."  App. at 156-58.   Besides the two matters identified by the ALJ, the Tallmans continue to assert the same additional violations that they pressed before the ALJ.  Specifically, they allege that the Barnegat defendants violated the IDEA by sabotaging Jason's chance to enter the Grove School, by instead placing him inappropriately at Wiley House (for fiscal reasons), by failing to provide him with a continuum of placement options[3], by failing to consider all Jason's disabilities, by attempting to exclude the Tallmans from the IEP process, and by refusing to provide Jason with an education in the least restrictive environment.

The Barnegat defendants mount two lines of defense.  First, they argue that, contrary to the findings of the ALJ, they did not commit even "technical" IDEA violations.  Second,

---

[3] A federal regulation promulgated under the IDEA requires that the state provide a continuum of placement options for the child.  See 34 C.F.R. § 300.551.  A corresponding state regulation requires that the child must be placed in the "least restrictive" environment along this continuum, as befits his or her disability.  N.J.A.C. § 6A:14-1.1(b)2 (formerly at § 6:28-1.1(b)1).  State statute lists the options that form the continuum of education programs, from least to most restrictive.  See N.J.S.A. § 18A:46-14.

they maintain that even if the technical IDEA violations cited by the ALJ did occur, they "were no[t] the bad faith type of violation that the IDEA targets." Appellees' Br. at 25. The Barnegat defendants emphasize that the IEP required by the IDEA constitutes "only a basic floor of opportunity," which was satisfied by placement at Wiley House. Id. They argue that the IDEA does not require the optimal services or additional benefits, which the Tallmans allege that the Grove School offered. See id. (citing Christen G. v. Lower Merion School Dist., 919 F. Supp. 793, 813 (E.D. Pa. 1996)).

We have carefully reviewed all of the alleged violations of the IDEA, both those accepted and those rejected by the ALJ, and we see no ground for reversing the grant of summary judgment. We begin with the Tallmans' argument that the failure to adopt an IEP prior to Jason's placement in Wiley House proximately caused his death. See Appellants' Br. at 55-56. The Tallmans claim that if an IEP had been developed before Jason was placed at Wiley House his death would have been prevented in two ways: (1) the IEP would have shown that Wiley House was inappropriate for Jason so he would not have been placed there in the first place and (2) if a psychiatrist's treatment plan had been attached to Jason's IEP, it "would have recommended against negative means of holding Jason down" because he would "respond to positive reinforcements." Appellants' Br. at 56.

This argument flies in the face of the settlement into which the Tallmans entered prior to Jason's placement at Wiley House. The settlement agreement provided for Jason to be placed at Wiley House but also ordered an independent evaluation immediately upon placement. The issue of whether Wiley House was an appropriate placement was held in

14

abeyance pending the completion of the independent evaluation.  <u>See</u> App. at 731;

Appellants' Br. at 17.  Having agreed to Jason's temporary placement at Wiley House, the

Tallmans cannot argue that his placement there without an IEP violated the IDEA.

The Tallmans note that after the settlement was reached and approved by the ALJ,

there was a further dispute about certain forms that Wiley House required the Tallmans to

sign as a condition of admission.  However, none of the disputed issues can possibly be

viewed as a proximate cause of Jason's death shortly after arriving at Wiley House.[4]

Some of the other violations alleged by the Tallmans also center on Jason's

placement at Wiley House, and accordingly the settlement dooms these allegations as well.

In addition, these allegations suffer from other flaws.  The Tallmans argue  strenuously that

the Barnegat defendants violated the IDEA because Jason's placement at Wiley House was

inappropriate.  Appellants' Br. at 35-37.  The Tallmans recount Mrs. Tallman's opposition

to Jason's placement at the Archway School because it did not consider Jason's "giftedness

along with the disabilities." <u>Id</u>. at 36.  The Tallmans also note the observations of a member

of the child study team that the Archway students were "streetwise" and "tough." <u>Id</u>.  The

Tallmans then argue that the Barnegat defendants nevertheless placed Jason in Wiley

---

[4]The dispute concerned providing insurance and other financial data, granting
permission for Wiley House to conduct an evaluation of Jason, authorizing Wiley House to
provide certain mental health treatment, and Wiley House's refusal to follow a vitamin
therapy regimen.  <u>See</u> App. at 733.
     The ALJ held that the forms could be reconciled with Jason's rights and determined
that the parents should sign the forms. <u>Id</u>.  The Tallmans did not take an administrative
appeal, and they do not challenge this decision in the present appeal.

15

House, which they claim was similar to Archway. Id. at 36-37. This discussion fails to show that placement at Wiley House violated the IDEA. As noted, in order to comply with the IDEA, a placement need not provide the maximum possible benefit but must provide "significant learning" and confer "meaningful benefit." Ridgewood Board, 172 F.3d at 247. The Tallmans' argument does not show that Wiley House would not have done this.

Moreover, the Tallmans fail to connect the features of Wiley House to which they object with the events leading to Jason's death. If the curriculum at Wiley House would not have accommodated Jason's intellectual gifts, that can hardly be viewed as a proximate cause of his death within a short time after arriving at the school. As for the character of the other students at Wiley House, it could be argued that character of the other students at Wiley House precipitated the fight that led to the physical restraint that caused Jason's death, but the Tallmans have not pointed to evidence in the summary judgment record supporting this chain of inferences. Jason had engaged in violent episodes in other settings, and we have not been shown evidence from which a trier of fact might reasonably infer that he would not have gotten into an altercation with another student if the students at Wiley House had not been "streetwise" and "tough."

The Tallmans complain at length that the Barnegat defendants "sabotaged" Jason's placement at the Grove School by providing the school with records from the Horsham Clinic suggesting that Jason had been involved in starting fires. See Appellants' Br. at 16-17, 48-53. However, the only provision of law cited by the Tallmans in their discussion of

16

this matter is a New Jersey regulation providing that each district board of education shall develop and adopt written policies and procedures to prevent "needless *public* labeling of pupils with educational disabilities." N.J.A.C. 6:28-1.4(a) (emphasis added) (former codification scheme). Putting aside the question whether a violation of this state regulation may be asserted under 42 U.S.C. § 1983, we do not see how privately providing records to a school that specializes in the education of students with disabilities can be viewed as a violation of this provision.[5] The ALJ observed: "To claim that the reports of facilities at which [Jason] was treated for his disability and illness should not be made available to a prospective placement is illogical and inconceivable." App. at 131. Without supporting authority other than that cited to us by the Tallmans, we must likewise conclude that the disclosure of the Horsham Clinic records did not violate the IDEA.

The Tallmans have thus failed to show on appeal that the Barnegat defendants acted improperly in connection with the Grove School's decision to withdraw its offer to enroll Jason, and this failure logically dooms two of the Tallmans other claims, i.e., (1) that the Barnegat defendants violated several New Jersey regulations by placing Jason in a more restrictive school (Wiley House) rather than a less restrictive one (the Grove School) and (2) that the Barnegat defendants favored Wiley House over Grove School for financial reasons. Unless the Barnegat defendants acted improperly in disclosing the Horsham Clinic records to the Grove School, they cannot be faulted for failing to place Jason in a

[5]The Tallmans have not adduced evidence showing that the Barnegats knew that the information in the Horsham Clinic records was incorrect.

school that refused to accept him.

With respect to the remaining violations alleged by the Tallmans, the summary judgment record is insufficient to establish that the alleged violations were proximate causes of Jason's death. Proximate cause is an essential element of a claim seeking to establish liability under § 1983. See Martinez v. California, 444 U.S. 277, reh'g denied, 445 U.S. 920 (1980).[6] Although the question of proximate cause must often be submitted to the trier of fact, summary judgment is proper if the record cannot reasonably support a finding of proximate cause, and in prior § 1983 cases, we have upheld summary judgment on this basis. See Best v. Essex County, 986 F.2d 54 (3d Cir. 1993) (no causal link between prison overcrowding and assault of plaintiff-detainee by a fellow detainee); Commonwealth Bank & Trust Co. v. Russell, 825 F.2d 12 (3d Cir. 1984), cert. denied, 471 U.S. 1131 (1985) (applying Martinez and finding insufficient causation between conduct of prison and county officials and the murder committed by a recently escaped inmate).

With respect to many of the violations asserted by the Tallmans, the lack of proximate cause is glaring. Several of the alleged violations occurred more than a year before Jason was placed at Wiley House, and the Tallmans have not satisfactorily explained how these alleged violations can reasonably be viewed as even but-for causes of Jason's

---

[6]Courts have generally found that proximate cause under § 1983 simply incorporates the causation principles of common-law torts. See Stevenson v. Koskey, 877 F.2d 1435 (9th Cir. 1989); Parratt v. City of Connersville, 737 F.2d 690 (7th Cir 1984); but see Doe v. Rains County Indep. Sch. Dist., 66 F.3d 1402 (5th Cir. 1995) (adopting "a heightened standard of proximate cause).

18

death. These alleged violations include the following: the failure to develop an IEP prior to Jason's placement in homebound instruction in March 1992 (Appellants' Br. at 34-35); the failure to provide a residential placement, rather than homebound instruction, during the 1991-92 school year (id. at 37-40); and the failure of the Barnegat Defendants to take necessary steps to identify Jason's disabilities before the time when they were finally identified and evaluated in March 1992 (id. at 41).

Other alleged violations also have no apparent connection to Jason's death. For example, the Tallmans complain that the Barnegat defendants failed to recognize that Jason had "problems with written language and medical problems" but that the Barnegat defendants "only addressed his behavior." Appellants' Br. at 40. Jason's death, however, resulted from steps taken by a Wiley House employee to deal with a perceived behavioral problem, and thus it is hard to see how the alleged failure of the Barnegat defendants to recognize Jason's other problems could be even a but-for cause of his death.

The same is true of the Tallmans' argument that the Barnegat defendants did not include them as joint and equal participants in the IEP process because the Barnegat defendants did not, among other things, support the Tallmans' desire that vitamin therapy be included as part of Jason's IEP. See Appellants' Br. at 41-42. How the inclusion of such therapy might have prevented Jason's death the Tallmans do not explain. In sum, we hold that none of the violations alleged by the Tallmans provide a basis for recovering damages

for Jason's death or injuries suffered at Wiley House.[7]

IV.

We come, finally, to the Tallmans' argument that the District Court should not have dismissed their second complaint and their new claim against the OAL. The Tallmans argue that the second complaint and the OAL claim challenged "the OAL and Department of education's failure to provide [them] with the procedural safeguards required by the IDEA." Appellants' Br. at 58. However, because we have not relied in any way on any determination made by the ALJ, we cannot see how the Tallmans can possibly have been

_____

[7]Seeking to circumvent the lack of evidence showing that IDEA violations were proximate causes of Jason's death, the Tallmans argue that they are also seeking damages for intangible injuries stemming directly from those violations. The Tallmans argue that these IDEA violations proximately caused Jason to lose something in addition to his life, namely, "the loss of a statutory right to a free appropriate public education" while he was still alive. Appellants' Br. at 56.

However, the alleged violations that are not based on Jason's placement at Wiley House – for example, the failure to develop an IEP prior to Jason's placement in homebound instruction from March to May 1992 – are so insubstantial that they are not actionable. See Doe v. Alabama State Dept. of Educ., 915 F.2d 651, 662 (11th Cir. 1990) (because the IEP-related violations at issue "had no impact on the [parents'] full and effective participation in the IEP process and because the purpose of the procedural requirement was fully realized, . . . there has been no violation in this case which warrants relief"); Tice v. Botetourt County School Board, 908 F.2d 1200 (4th Cir. 1990) (denying relief for "procedural violations [that] had no impact on whether [the child's ] IEP adequately" provided him with a free appropriate public education); Evans v. District No. 17 of Douglas County, Neb., 841 F.2d 824 (8th Cir. 1988) (denying relief after concluding that the school's failure to reevaluate the child at the appropriate time did not harm the child's educational progress in any way). See also Doe v. Defendant I, 898 F.2d 1186 (6th Cir. 1990) (holding that a delay in completing IEP was acceptable where the parents requested that intervention be postponed until after a trial period); Myles v. Montgomery County Bd. of Educ., 824 F. Supp. 1549 (M.D. Alabama 1993) (excusing a delay in completing an IEP as a merely technical violation).

harmed by any action taken by the ALJ, the OAL, or the DOE in connection with the remand. In any event, we see no merit in the Tallmans arguments regarding this issue.

We have the greatest sympathy for loss that the Tallmans have suffered and can well understand their belief that the educational authorities collectively should have done something to prevent the death of a gifted but troubled 12-year-old boy. However, after carefully considering all of the Tallmans' arguments, we see no ground for reversing the order of the District Court. If Jason's death was wrongful, the proper remedy is provided by state tort law, not the IDEA.[8]

### III.

For the reasons explained above, we affirm the District Court's award of summary judgment to the Barnegat defendants. As a result, we need not determine whether the thrid-party defendants are subject to indemnification and contribution.

---

[8]The Tallmans note in their brief that they filed a wrongful death action against Wiley House and others in the United States District Court for the Eastern District of Pennsylvania and that the case was settled. See Appellants' Br. at 1.

21