JOHN J. MCCONNELL, JR., United States District Judge.
This is an action for review of the decision ("Decision")[1] of a due process hearing *375 officer ("Hearing Officer") under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. ("IDEA" or the "Act"). Among its findings, the Hearing Officer concluded that Chariho Regional School District ("Chariho") failed to provide S.C. a free appropriate public education ("FAPE") under its last proposed individualized education program ("IEP"), but also that the Grove School, S.C.'s desired residential placement, was inappropriate. The Hearing Officer did not award any other compensatory relief to S.C. The Hearing Officer also did not decide whether earlier iterations of IEPs provided S.C. with a FAPE.
The parties have filed cross-motions for summary judgment. ECF Nos. 10, 17. After review of the administrative record, briefing, and oral argument, the Court reverses in part the Hearing Officer's Decision.
I. BACKGROUND
S.C. is a young woman with a troubled history. Although she performed well academically early in life, she began experiencing difficulties in middle school. By October of 2011, S.C. was in counseling with a social worker, Lori Duffy. S.C. Ex. 3 at 2. Ms. Duffy provided individual treatment and parent consultation from 2011 to 2012 because of S.C.'s decrease in school performance and increase in school avoidance. Id. By February of 2012, a truancy petition had been filed because of S.C.'s excessive absences. S.C. Ex. 17.
S.C.'s first psychological exam was performed in the spring of 2012. S.C. Ex. 7 at 1. She was diagnosed with Mood Disorder NOS and Oppositional Defiant Disorder. Id. at 11. By the summer of 2012, S.C. was experiencing psychological stress, causing problems at home and at school. See S.C. Ex. 3 at 1. At the end of the summer, S.C. was hospitalized. S.C. Ex. 11. Bradley Hospital noted that S.C. had a history of oppositional behavior, defiance, school avoidance, and had expressed thoughts of being "better off dead." S.C. Ex. 12. Chariho school psychologist Tara Reddington recommended this hospitalization. S.C. Ex. 11.
Ms. Reddington also recommended that S.C. attend the RYSE Alternative Learning Program ("RYSE"). Id. RYSE is a clinical day program at Chariho for at-risk youth and their families that partners with community and school support services. S.C. Ex. 15. RYSE offers weekday education services and has clinical services available twenty-four hours a day, 365 days a year. Id. As part of her application for RYSE, S.C. wrote that she would be less anxious in the program. S.C. Ex. 13 at 6. This would hopefully help; around this time, Dr. Jacob Abraham diagnosed S.C. with Mood Disorder NOS, Anxiety Disorder NOS, and Oppositional Defiant Disorder. S.C. Ex. 5 at 10. In September of 2012, S.C. moved from Chariho Middle School to RYSE. S.C. Ex. 14.
Unfortunately, however, S.C.'s difficulties continued at RYSE. Susan Meyer, the therapist S.C. was seeing at the time, noted that RYSE did not seem to be working. S.C. Ex. 4 at 9. N.C., S.C.'s mother, also believed S.C. was having difficulties at RYSE. Vol. I, 42:10-21. These suspicions proved true when, in January of 2013, S.C. overdosed on ibuprofen. S.C. Ex. 16 at 2. Bradley Hospital, where S.C. was taken, recommended trying to return S.C. to mainstream schooling. Id. After this hospitalization, N.C. transferred S.C. back to Chariho Middle School. Vol. I, 46:16-25. By this point in the school year, S.C. had missed over forty days of school, in addition to some twenty late arrivals. Chariho Ex. 7 at 1.
February saw numerous reports and evaluations concerning S.C. Ms. Reddington believed that S.C.'s overdosing was atypical of a suicide attempt and "more *376 indicative of an impulsive, reactive response to a situation that [S.C.] was upset about at home." S.C. Ex. 22. Ms. Reddington arranged for a case history evaluation of S.C. which noted S.C.'s diagnoses of Mood Disorder NOS, Anxiety Disorder NOS, and Oppositional Defiant Disorder, and that she was taking Prozac and Abilify. S.C. Ex. 24 at 3; see Vol. I, 59:11-14. The evaluation posited that S.C. had avoided school and other uncomfortable activities and that her behavior was being reinforced by these outcomes. S.C. Ex. 24 at 17. Ms. Reddington also prepared a transition plan for S.C. to return to school; S.C. refused. S.C. Exs. 25, 26. Dr. Abraham believed that she wanted to be home schooled and that she would push until she got what she wanted. S.C. Ex. 26. By the end of February, S.C. had some eighty "missed or interrupted" school days for the year. S.C. Ex. 27.
In March of 2013, S.C. was determined to be ineligible for special education. S.C. Ex. 28 at 3; S.C. Ex. 29 at 3. Dr. Abraham reported that S.C.'s school refusal was due to anxiety, mood problems, and a wish to be home schooled. S.C. Ex. 31. Dr. Abraham was in favor of proceeding with truancy proceedings, perhaps simultaneously with treatment. Id. Later in March, S.C. was hospitalized for cutting herself with a razor after an incident with some girls from school. S.C. Ex. 118 at 16.
From late April to mid-June, S.C. lived with her father. S.C. Ex. 33 at 2. During this period of time, her father took her off medication and S.C. did not regularly see a therapist. Id. During this period of time, however, she was getting to school more regularly. Id. For the 2012-2013 school year, S.C. missed sixty-five days of school and was late forty-one times. S.C. Ex. 35. S.C. was rated proficient with distinction in reading, substantially below proficient in math, and proficient in writing. S.C. Ex. 112 at 1.
S.C. attended summer school in 2013 and performed well: her portfolio grade was 93%, she had full attendance, and was not tardy. S.C. Ex. 37; Vol. I, 68:21-69:1. The following year, S.C. attended Curtis Corner Middle School. S.C. Ex. 40. Her grades were largely failing. Id.
Following another overdose (this time on Tylenol ) and hospitalization in January of 2014, S.C. returned to Chariho. S.C. Ex, 41; S.C. Ex. 43; Vol. I, 72:17-22. An agreed upon term of S.C.'s return was that she attend school daily. S.C. Ex. 44.
S.C. was hospitalized again in March. S.C. Ex. 45. She was cutting herself because she was distraught that her father did not text her for her birthday and that she had to go back to school. S.C. Ex. 45 at 1; Vol. I, 86:25-87:12. S.C. was provided with additional supports, including a social worker to help her at school, and a social worker to visit her at home. S.C. Exs. 46, 47.
Unfortunately, these additional resources did not help. See Vol. I, 89:25-90:8. S.C. continued to accumulate absences, was struggling academically, and risked being held back a grade. S.C. Exs. 50, 51. In addition, S.C. was hospitalized in May for suicidal thoughts and an inability to function. S.C. Ex. 52. Chariho determined S.C. was eligible for a 504 plan[2] and provided accommodations. S.C. Exs. 56, 57. Despite some academic improvements (see S.C. Ex. 58), S.C. was hospitalized again in September for contemplating suicide (S.C. Ex. 65).
*377 October of 2014 was another busy month of evaluations. Brett Leimkuhler, PhD, conducted a neuropsychological evaluation of S.C. See S.C. Ex. 68. His diagnoses included Major Depressive Disorder, Severe; Anxiety Disorder; Disruptive Mood Dysregulation Disorder; Learning Disorder; and Attention Deficit Hyperactivity Disorder. Id. at 1. Dr. Leimkuhler took issue with previous diagnoses of oppositional defiance, believing it contributed to a view that S.C.'s problems were behavioral and "willful," and not serious psychiatric issues. Id. at 2. Dr. Leimkuhler recommended S.C. be placed in a therapeutic school setting and that she remain in a hospital day program until a therapeutic school became available. Id. ; S.C. Ex. 121. Chariho also performed two evaluations of S.C. in October. S.C. Exs. 69, 70. At the end of the month, S.C. again was hospitalized for suicidal behavior. S.C. Exs. 71, 72; Vol. I, 111:15-22. After this, N.C. was willing to try RYSE again. Chariho Ex. 3 at 39.
In November, Chariho's team finally concluded that S.C. was eligible for special education services. S.C. Ex. 74 at 3. That month, the IEP team convened to develop an IEP; however, because S.C. had not been attending school, the team decided to gather information while S.C. was being home tutored. S.C. Ex. 77 at 4, 5; see S.C. Ex. 117. Dr. Leimkuhler again offered his opinion that S.C. needed a therapeutic placement, and that S.C. could not attend school for the remainder of the semester. S.C. Ex. 75. At the end of the month, S.C. was briefly hospitalized again for self-cutting. S.C. Ex. 118 at 35.
On December 31, 2014, S.C. was allegedly raped, and she was hospitalized one week later for worsening depression and suicidal ideation. S.C. Ex. 79; Vol. I, 120:10-121:11. Dr. Leimkuhler believed S.C. could not return to RYSE because the alleged perpetrator was a RYSE student; he believed S.C. needed a therapeutic school. S.C. Ex. 78.
On March 4, 2015, the IEP team met to revise the initial IEP. S.C. Ex. 89. N.C. provided Chariho with a summary of her concerns, outlining goals that she wished S.C. to achieve. S.C. Ex. 84. Both N.C. and Chariho also agreed to have Dr. Steven Feldman conduct an assessment of S.C. Vol. VIII, 33:13-21. The evaluation took place later that month. S.C. Ex. 85. Dr. Feldman believed that S.C. could attend RYSE and receive a FAPE as long as the risk of contact between S.C. and her alleged rapist were minimized and there was a safety plan in place should they come into contact. Id. at 6. Dr. Feldman also believed that S.C. needed dialectical behavioral therapy ("DBT"), which, if successful, could allow Chariho to be the least restrictive setting. Id. at 5-7.
On April 1, 2015, the IEP team met again. S.C. Ex. 86. Chariho offered to place S.C. at RYSE with DBT either outside or within RYSE. Id. The team revised the last IEP, including requiring S.C. to understand concepts and skills related to DBT. S.C. Ex. 89. The team needed more information from Rhode Island Cognitive Behavioral Therapy, however, and so they planned to reconvene. S.C. Ex. 86. Later that month, Chariho proposed a plan to reintegrate S.C. to RYSE, with the goal of working S.C. up to full-time attendance by August. S.C. Ex. 87.
In mid-April, S.C. was evaluated by Jared Minkel, PhD, of Rhode Island Cognitive Behavioral Therapy. S.C. Ex. 120 at 4. Dr. Minkel would meet with S.C. weekly for approximately the next six months. See id. His plan included cognitive behavioral therapy ("CBT") informed by DBT skills. Id. at 5-6. By around this time, S.C. had missed 121 days of the 2014-2015 school year. S.C. Ex. 88.
The IEP team met again in May to discuss S.C.'s reentry into RYSE. S.C. Ex.
*378 90. A short time later, N.C. requested a residential placement for S.C. S.C. Ex. 92. S.C. had recently been taken to Bradley Hospital for a violent incident toward her mother in which she flipped over furniture and threw kitchen pots at N.C. S.C. Ex. 93 at 4. At the end of the 2014-2015 school year, S.C. had 154 absences, and she was failing. S.C. Ex. 96.
In August, with the beginning of the next school year impending, S.C. was admitted to Butler Hospital for self-cutting. S.C. Ex. 102. The next day, N.C. again requested a residential placement for S.C. S.C. Ex. 99. In the meantime, S.C. was discharged from Butler to Newport Academy, a residential treatment center. S.C. Ex. 109 at 18. The IEP team met and decided to gather information from Butler and Newport Academy; Chariho also requested a social history of S.C. S.C. Ex. 100.
On October 1, 2015, the IEP team convened and updated S.C.'s IEP. S.C. Ex. 104A. Perhaps most relevant for purposes of the instant action was the way the meeting ended. N.C. and her attorney believed the plan would not work and again requested a residential placement; Chariho refused. Vol. II, 12:10-16. At this point, N.C.'s attorney said "[t]his is bullshit" and left the meeting with N.C. Vol. VII, 29:4-30:6.
In the meantime, S.C. remained at Newport Academy. See S.C. Ex. 109 at 18. While there, S.C. was not without incident; N.C. testified that her daughter ran away and had a depressive episode. Vol. II, 10:8-18. A social worker from Newport listed as a "recommendation" that S.C. had pending admission to the Grove School. S.C. Ex. 109 at 19. N.C. testified that the Grove School accepted S.C. Vol. II, 17:16-17.
S.C. left Newport Academy on November 10, 2015. S.C. Ex. 109 at 18. Any gains made by S.C. at Newport did not last; in December, she was again hospitalized at Butler for suicidal ideation. Chariho Ex. 9 at 3. Among S.C.'s diagnoses were an unspecified depressive disorder, an unspecified anxiety disorder, and post-traumatic stress disorder. Chariho Ex. 9 at 10.
A few weeks after the failed October team meeting, N.C. requested a due process hearing from the Rhode Island Department of Education. Decision at 5. N.C. requested, inter aha, compensatory education and reimbursement for S.C.'s placement at Newport or another residential placement. Ct. Ex. A.[3] A pre-hearing conference was held in mid-December. Decision at 2. In early January of 2016, S.C. specified for the first time during the administrative proceedings that she was seeking placement at the Grove School. ECF No, 21 at 16; ECF No. 17-1 at 34 n.36; see Ct. Ex. A. The next day, Chariho offered S.C. an "alternative education plan." Decision at 52.
The due process hearing commenced in late January and lasted eight days over the next two-and-a-half months. Decision at 5. On August 20, 2016, the Hearing Officer issued his Decision. Id. at 58. The Hearing Officer made numerous findings, including that the October 2015 IEP did not provide a FAPE to S.C. Decision at 57. Nevertheless, the Hearing Officer concluded that an out-of-district placement at the Grove School was inappropriate; the Hearing Officer also declined to award any other compensatory relief. Id. at 4, 57-58. The Hearing Officer did not reach any decision about whether earlier iterations of S.C.'s IEPs provided her with a FAPE. The following month, S.C. sought review in this Court under 20 U.S.C. § 1415(i)(2).
*379 II. STANDARD OF REVIEW
When an action is brought challenging a hearing officer's decision, the IDEA provides that the court:
(i) shall receive the records of the administrative proceedings;
(ii) shall hear additional evidence at the request of a party; and
(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.
20 U.S.C. § 1415(i)(2)(C). A party seeking to overturn a hearing officer's decision bears the burden of proof. Roland M. v. Concord Sch. Comm. , 910 F.2d 983, 991 (1st Cir. 1990) ("[I]n cases arising under the Act, the burden rests with the complaining party to prove that the agency's decision was wrong.").
The Court uses an "intermediate standard of review" between administrative deference and de novo review. Lenn v. Portland Sch. Comm. , 998 F.2d 1083, 1086 (1st Cir. 1993) ; see Roland M. , 910 F.2d at 989 ("The court's principal function is one of involved oversight."). The Court is "not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason." Lenn , 998 F.2d at 1087. Indeed, the Court's "independence is tempered by the requirement that the court give 'due weight' to the hearing officer's findings," which "reflects the concern that courts not substitute their own notions of educational policy for that of the state agency, which has greater expertise in the educational arena." Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm. , 361 F.3d 80, 83-84 (1st Cir. 2004) (quoting Roland M. , 910 F.2d at 989 ); see Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley , 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).
"[I]f a state administrative agency has heard live testimony and has found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness, that determination is due special weight." Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S. , 381 F.3d 194, 199 (3d Cir. 2004). "Specifically, this means that a District Court must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion.' " Id. (quoting Carlisle Area Sch. v. Scott P. ex rel. Bess P. , 62 F.3d 520, 529 (3d Cir. 1995) ); accord Sudbury Pub. Schs. v. Mass. Dep't of Elementary & Secondary Educ. , 762 F.Supp.2d 254, 262 (D. Mass. 2010) ("Credibility determinations are the province of the factfinder, in this case the Hearing Officer.").
When a court decides a case on the administrative record, "the parties' cross-motions for summary judgment serve as a procedural device, in which the burden of proof rests with the party seeking to overturn the Hearing Officer's Decision." Coventry Pub. Schs. v. Rachel J. , 893 F.Supp.2d 322, 332 (D.R.I. 2012) ; see Roland M. , 910 F.2d at 991.
III. DISCUSSION
S.C. bears the burden of proof in overturning the Decision. Her first challenge is that the Hearing Officer erred in failing to order a remedy for the denial of FAPE between October 1, 2015, and the date of the Decision. Her second issue is that the Hearing Officer failed to determine whether Chariho provided her with a FAPE in two IEPs promulgated between November 2014 and October 2015. The Court addresses each of these topics, and the related issues they present, in turn.
A. S.C. is entitled to a remedy for the denial of FAPE beginning October 1, 2015.
The principal dispute in this case is whether Chariho provided S.C. a FAPE
*380 with the October 1, 2015 IEP. The Hearing Officer concluded that, while Chariho failed to provide S.C. a FAPE, she was not entitled to a remedy. First, the Court must determine whether it is bound by this finding, Second, the Court turns to whether the Grove School was an appropriate placement. Finally, the Court turns to whether S.C. is entitled to some other compensatory relief.
1. This Court is bound by the Hearing Officer's determination that Chariho failed to provide S.C. with a FAPE as of October 1, 2015.
The threshold issue the Court must address is whether it can disturb the finding that Chariho failed to provide S.C. a FAPE as of October 1, 2015. S.C. argues that Chariho did not file a cross-appeal from the Hearing Officer's Decision as an "aggrieved party," and so it is stuck with this finding. Chariho argues that it could not appeal from a decision in which it received all the relief it requested.
The IDEA allows for an "aggrieved party" to seek administrative review in federal district court:
Any party aggrieved by the findings and decision made under subsection (f) or (k) who does not have the right to an appeal under subsection (g), and any party aggrieved by the findings and decision made under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy.
20 U.S.C. § 1415(i)(2)(A).
Generally speaking, "[a] party may not appeal from a favorable judgment." Alberty-Velez v. Corporation de P.R. para la Difusion Publics , 361 F.3d 1, 5 n.4 (1st Cir. 2004) (citing California v. Rooney, 483 U.S. 307, 311, 107 S.Ct. 2852, 97 L.Ed.2d 258 (1987) ). "A party who receives all [it] has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it." Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper , 445 U.S. 326, 333, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980). Absent a cross-appeal, the party that prevailed below "may argue for affirming ... based on arguments that the [lower] court rejected." Alberty-Velez , 361 F.3d at 5 n.4 ; see also United States v. Am. Ry. Express Co. , 265 U.S. 425, 435, 44 S.Ct. 560, 68 L.Ed. 1087 (1924) ("[T]he appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.").
However, an appellee "may not 'attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary.' " El Paso Nat. Gas Co. v. Neztsosie , 526 U.S. 473, 479, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999) (quoting Am. Ry. Express Co. , 265 U.S. at 435, 44 S.Ct. 560 ). To do so, a respondent must file a cross-appeal; this is not to "penalize parties who fail to assert their rights, but ... to protect institutional interests in the orderly functioning of the judicial system, by putting opposing parties and appellate courts on notice of the issues to be litigated and encouraging repose of those that are not." Id. at 481-82, 119 S.Ct. 1430.
Under the IDEA, S.C. was clearly an "aggrieved" party and properly sought *381 review of the Decision in this Court. Chariho believes it could not bring a counterclaim-procedurally equivalent here to a cross-appeal-as it was not "aggrieved" under the IDEA. This argument is unavailing, Chariho was "aggrieved" by the finding that it failed to provide FAPE to S.C., as this finding potentially entitles S.C. to relief, even if she did not obtain her desired placement at the Grove School.
Chariho argues that "an appeal is taken from a judgment, not from a finding, and the Hearing Officer denied S.C.'s demand that he order Chariho place S.C. at the Grove School," ECF No. 26 at 3. This is not an appeal taken from a civil judgment, however; this is an action for review of an administrative decision, and the text of the IDEA specifically allows parties aggrieved by findings to file suit in federal district court to overturn a hearing officer's decision. See 20 U.S.C. § 1415(i)(2)(A). In any event, even if Chariho did not feel compelled to initiate an action on its own, once S.C. filed suit in this Court, Chariho could have brought a counterclaim.[4]
Because Chariho is an aggrieved party and failed to bring a counterclaim under the IDEA, this Court cannot review the Hearing Officer's finding that Chariho failed to provide S.C. a FAPE as of October 1, 2015.[5]
2. The Grove School was not an appropriate placement for S.C.
Although the Court must adhere to the Hearing Officer's finding as to FAPE beginning October 1, 2015, that does not end the inquiry. The Court must next address whether S.C.'s proposed private school placement-that is, the Grove School-was "proper under the Act." Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter , 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).
"[A] private school placement is 'proper under the Act' if the education provided by the private school is 'reasonably calculated to enable the child to receive educational benefits.' " Id. at 11, 114 S.Ct. 361 (quoting Carter ex rel. Carter v. Florence Cty. Sch. Dist. Four , 950 F.2d 156, 163 (4th Cir. 1991) ). The private school must offer "at least 'some element of special education services in which the public school placement was deficient.' " Mr. I ex rel. L.I. v. Me. Sch. Admin. Dist. No. 55 , 480 F.3d 1, 24 (1st Cir. 2007) (quoting Berger v. Medina City Sch. Dist. , 348 F.3d 513, 523 (6th Cir. 2003) ). And the proposed placement need not meet "every last one of the child's special education needs." Id. at 25. Ultimately, however, "the reasonableness of the private placement necessarily depends on the nexus between the special education required and the special education provided." Id.
In Mr. I , the First Circuit upheld a finding that the private placement of LI, a child with Asperger's, was inappropriate. LI's parents placed her at a private school following difficulties at her public school and a suicide attempt. Id. at 6. LI's clinicians recommended she receive direct *382 teaching of social skills and cognitive behavioral therapy. Id. at 7. Although LI "thrived academically" and "developed positive relationships with some of her peers," the private school "provided LI with neither the direct teaching of social skills nor the cognitive behavioral therapy that had been recommended as treatment for her Asperger's." Id. After evaluating the connection between the treatment provided by the private school and the special education services recommended by the child's IEP team and the experts who evaluated her, the district court concluded that the school was not an appropriate placement. Id. at 24. The First Circuit upheld this finding, noting that the school "did not offer anything approaching the direct teaching of social skills unanimously endorsed by the professionals who have tested and treated LI" and that the school "simply does not provide the special education services that LI's mental health professionals have prescribed." Id. at 25.
The record is clear that the Hearing Officer found that Chariho's expert, Dr. Feldman, was more credible than S.C.'s expert, Dr. Leimkuhler. See Decision at 47-50. Specifically, the Hearing Officer cited Dr. Feldman's forty-plus years of expertise in child and adolescent psychiatry to be "exceptional and outstanding." Decision at 48. The Hearing Officer also relied on the "somewhat unusual" fact that both N.C. and Chariho had requested an evaluation of S.C. by Dr. Feldman; this was "evidence that they [both] had confidence in Dr. Feldman's capabilities." Id. ; see Vol. VIII, 33:13-21. With respect to Dr. Leimkuhler, the Hearing Officer noted that he reviewed fewer records, and that he had more limited knowledge of and experience with DBT. Decision at 48. The Hearing Officer also cited an example of Dr. Leimkuhler's opinion changing when confronted with a contradictory report. Id. The Hearing Officer then noted several opinions of Dr. Leimkuhler which were contradicted by Dr. Feldman, including that "DBT is intended to be part of an inpatient program." Id. at 50.
This Court, reviewing a cold administrative record, defers to the credibility determinations of the Hearing Officer, who heard live testimony and whose credibility findings are entitled to special weight. See Shore Reg'l High Sch. , 381 F.3d at 199 ; Sudbury Pub. Schs. , 762 F.Supp.2d at 262. As a result, the Court similarly considers the testimony of Dr. Feldman as the more credible. Cf. Mr. I , 480 F.3d at 25 (evaluating school's services against services unanimously recommended by experts).
S.C. fails to prove that the nexus between her special education needs and what the Grove School can provide is sufficient to make that placement proper under the Act. The administrative record leads the Court to two conclusions. First, the more credible expert testified that S.C. needed DBT and CBT, combined with family therapy in a setting with close family and community involvement. Second, while the Grove School does provide CBT and DBT, it does not provide the level of family and community involvement that the more credible expert testified was medically necessary.
Dr. Feldman's central recommendation was that S.C. be provided with DBT. S.C. Ex. 85 at 5; Vol. VIII, 93:10-21. A preponderance of the evidence in the record does suggest that the Grove School provides some form of CBT and DBT. Peter Chorney, the executive director of the Grove School, testified before the Hearing Officer that, although the Grove School is "not a licensed DBT program," the school does use DBT. Vol. IV, 3:6-10, 30:23-24. Mr. Chorney further testified that while the school does not "define [itself] as a DBT program, nor ... as a CBT program," it does use both of those therapies "when it *383 makes sense." Vol. IV, 31:1-4. He also testified that most or all of the Grove School therapists are trained in DBT. Vol. IV, 11: 16-19. Mr. Chorney explained that DBT is "a tool we can use for students," is one they have used in the past, and "could or could not, depending on the child" be used in treatment. Vol. IV, 11:20-12:3. Patrick McAvoy, an admissions officer for the Grove School, told Jennifer Durkin, the special education director at Chariho, that while the Grove School was "not a DBT program," the school does "utilize many of the skills taught in DBT." Chariho Ex. 5 at 1; Vol. IV, 15:20-21; see also Vol. IV, 30:17-23 (additional statement by Mr. McAvoy that Grove not a DBT program). Whether or not the school is licensed as or considers itself a DBT program may be a matter of semantics; it is clear that the Grove School has DBT-trained therapists and can offer some level of that treatment to students who need it.
However, this does not mean the Grove School can provide S.C. the specific treatment that she needs. Dr. Feldman testified that DBT at a residential placement would not be best for S.C. In general, Dr. Feldman testified that for DBT, outpatient, community-based treatment is the "gold standard of treatment." Vol. VIII, 57:9-12; see Vol. VIII, 52:15-24 (describing DBT as "basically an outpatient program," that is a "community-based practice"), 56:13-24 (explaining importance of outpatient setting). While DBT could be conducted on an inpatient basis, it is usually not. Vol. VIII, 51:16-20, 78:20-79:1. With respect to S.C.'s specific needs, Dr. Feldman testified that the goal for a person with borderline personality disorder like S.C. is an outpatient placement. Vol. VIII, 66:8-15.
Dr. Feldman also testified to the importance of family involvement in the therapeutic process. Based on his review of literature on the efficacy of residential placement for children with mental health issues, Dr. Feldman testified that "gains made in a residential treatment program, absent any changes in the family or community, wash out within six to eight weeks or longer. The gains are not sustained."[6] Vol. VIII, 85:3-12. For this reason, he testified, the "psychoeducation" of the family is a component of DBT for someone with a borderline personality disorder. Vol. VIII, 53:7-17. Dr. Feldman also testified that family therapy is "very important" in therapy of adolescents "because they live in families." Vol. VIII, 83:8-11. The family must be aware of the skills the adolescent is developing, what the goals are, what the child is working on, and how the family can contribute to making things better. Vol. VIII, 83:11-18. Dr. Feldman specifically noted that, "[g]iven how difficult borderline personality disorder is to live with, family therapy is very important when you're treating borderline personality disordered individuals." Vol. VIII, 83:19:22.
With respect to the Grove School, Dr. Feldman testified that, from reading the school's website, he believed the Grove School families to be on campus twice a month for family therapy. Vol. VIII, 84:3-8; see S.C. Ex. 123 at 46 (Grove School website stating that family visits occur "at least once per month"). Dr. Feldman testified that even twice-a-month family therapy would be insufficient for someone with a borderline personality disorder like S.C. Vol. VIII, 84:9-21. Ultimately, Dr. Feldman testified that, to a reasonable degree of medical certainty, S.C. would not sustain *384 emotional, social, or academic gains made at the Grove School. Vol. VIII, 91:11-92:25.
S.C. argues that Dr. Feldman's views are premised on the assumption that the Grove School is not a DBT program. It is true that, in his ultimate opinion testimony, he was asked to assume that the Grove School was "not a DBT program." See id. However, as discussed above, Dr. Feldman's principal concern with Grove's provision of DBT is that it takes place in an inpatient setting. Indeed, Dr. Feldman's opinions seem firmly-and fairly-rooted in the fact that the Grove School is a residential placement that provides limited opportunity for family involvement.
To rebut the claim that Grove has limited family involvement, S.C. cites to the Grove School website, which states that "[f]amily sessions occur at least once per month and are preferably done in person at the School." S.C. Ex, 123 at 46. While conceding that perhaps twice monthly family therapy "might not be enough," she argues that family involvement "is not capped at any specific amount" at Grove. ECF No. 21 at 30. Although the phrasing of the language does suggest that families may be more involved, S.C. points to no other evidence or testimony that visits actually are more frequent. In addition, the record suggests that the number of in-person visits could actually be less: the school also allows for "teleconferences" in place of family therapy where there is "significant distance or other logistical problems." S.C. Ex. 123 at 46. In any event, Dr. Feldman already assumed that visits at Grove would be twice the amount stated on the school's website, and still found this insufficient.
Taken together, the Court finds by a preponderance of the evidence that the Grove School would not be able to offer S.C. the special education services that the more credible expert testified were necessary. Accordingly, S.C. has failed to prove that the nexus between her needs and what the Grove School provides is sufficient to render the school a proper placement under the Act.
3. S.C. is entitled to some amount of compensatory education.
Aside from any relief related to the Grove School, S.C. argues she is entitled to compensatory education as a matter of law because the Hearing Officer concluded that she was denied a FAPE. The Court must first address Chariho's contention that S.C. waived any right to compensatory education by failing to exhaust her administrative remedies. Finding that she did not, the Court considers whether S.C. is entitled to compensatory education, particularly in light of the actions of N.C. and her attorney at the October 2015 IEP meeting.
"Compensatory education is a surrogate for the warranted education that a disabled child may have missed during periods when his IEP was so inappropriate that he was effectively denied a FAPE." C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist. , 513 F.3d 279, 290 (1st Cir. 2008) (citing Me. Sch. Admin. Dist. No. 35 v. Mr. & Mrs. R. , 321 F.3d 9, 18 (1st Cir. 2003) ). "However, compensatory education is not an automatic entitlement but, rather, a discretionary remedy for nonfeasance or misfeasance in connection with a school system's obligations under the IDEA." Id.
Compensatory education may be awarded even after a child's eligibility for special education services has expired. See Mr. & Mrs. R , 321 F.3d at 17-18. In determining how much compensatory education a student is entitled to, the right "accrues from the point that the school district knows or should know of the IEP's failure."
*385 Linda E. v. Bristol Warren Reg'l Sch. Dist. , 758 F.Supp.2d 75, 92 (D.R.I. 2010). In seeking compensatory education, a party need not show precisely what services a student should have, but did not, receive. Mr. & Mrs. R, 321 F.3d at 20.
However, "parties ordinarily must exhaust administrative remedies under the IDEA before initiating court action," including the remedy of compensatory education. Pihl v. Mass. Dep't of Educ. , 9 F.3d 184, 190 (1st Cir. 1993). In Pihl , the First Circuit reviewed whether the plaintiffs had waived a claim to compensatory education by failing to present it to the administrative agency. Id. The court noted that the plaintiffs did raise the issue before the administrative body, and that this did "not automatically bar[ ] from consideration" the claim on appeal. Id. The court also found that the agency explicitly deferred decision on the issue of compensatory education and that it never returned to the claim. Id. However, the First Circuit determined that the hearing officer did not "bear[ ] sole responsibility" for his failure to address the plaintiffs' right to compensatory education, and that "plaintiffs' own actions should also be considered." Id. at 191. Specifically, the court pointed to a letter in which the plaintiffs waived determination by the hearing officer of any other issue than the appropriateness of the child's current educational placement. Id. Ultimately, the First Circuit remanded the case to the district court to determine the exhaustion issue. Id.
In this case, S.C. argues that she "could and did still assert a claim for compensatory damages in her initial filing of a due process complaint and the later supplement." ECF No. 21 at 9. And that is true: in her original administrative complaint, "[c]ompensatory educational services" is the first remedy sought. Ct. Ex. A. While the four-sentence supplement does not mention compensatory education, this does not waive any claim to relief she originally sought. Rather, the supplement merely sets forth factual developments with S.C. since the filing of the initial complaint, and clarifies that the "particular" residential placement she is seeking is the Grove School. See id. Because she sought compensatory education at the outset of her administrative proceedings, her compensatory education claim is not "automatically barred from consideration." Pihl , 9 F.3d at 190.
Chariho argues that, much like the plaintiffs in Pihl , S.C. agreed that the Hearing Officer need only decide a narrow issue: whether she was entitled to residential placement at the Grove School. Early on in the administrative hearing, the parties discussed the logistics of having someone from the Grove School testify. S.C.'s attorney cautioned that they need not be limited to the Grove School, stating:
[W]e like Grove School, we'd like to go to Grove School, but if the hearing officer at the end of this said, you know, a residential therapeutic placement is ordered, then it's not magic for Grove School. There are other facilities that meet that criteria, although we like Grove School.
Vol. II, 42:4-10. The Hearing Officer responded, "I don't see me as hearing officer picking somebody other than Grove School; do you understand that?" Vol. II, 42:16-18. S.C.'s attorney responded, "That's fine. Absolutely." Vol. II, 42:19-20.
Chariho also points to a second exchange on the second to last day of the hearing. The Hearing Officer interrupted S.C.'s attorney to clarify that she was questioning the witness only about the Grove School: "Is it my understanding that the parents are still asking that the child, the student go to the Grove School?" Vol. VII, 45:22-25. S.C.'s attorney responded, "The Grove School, or a similar residential placement." Vol. VII, 46:1-2. After objection from Chariho's attorney, the Hearing *386 Officer responded: "I don't know what that means. Throughout this very long hearing it was the Grove School, I understand?" Vol. VII, 46:5-7. S.C.'s attorney responded "Yes," and the Hearing Officer replied, "If you're going to go into something similar, that's not good enough for me. So I kind of was under the impression we weren't sure if it was the Grove School anymore. But it is. Thank you." Vol. VII, 46:8-13.
The Court does not believe that these exchanges are significant enough to constitute a waiver to any relief other than placement at the Grove School. Both of these conversations occurred once it became unclear whether S.C. was seeking placement only at the Grove School, or whether she was seeking some residential placement, preferably at the Grove School. In both exchanges, S.C.'s attorneys clarified that the only residential placement they wished to have considered was the Grove School; they did not state that residential placement at the Grove School was the only relief they were seeking.
Chariho claims that it "relied on th[ese] admission[s] in framing its entire case." ECF No. 17-1 at 103; see Vol. VII, 46:3-4. When S.C.'s attorney's comments are properly understood, this objection is meaningless. Plaintiff's counsel conceded they would seek no residential placement other than the Grove School; Chariho accepted this paradigm and litigated accordingly. Whether S.C. is entitled to compensatory education depends primarily on whether she was provided a FAPE-an issue that Chariho litigated and lost before the Hearing Officer. Accordingly, the Court concludes that S.C. did not fail to exhaust her claim for compensatory education.
However, that does not end the inquiry. This Court has discretion to award compensatory education as a remedy for any "nonfeasance or misfeasance" in connection with Chariho's failure to provide a FAPE to S.C. See C.G. , 513 F.3d at 290. However, there is ample evidence in the record to suggest that the failure of the October 2015 IEP to provide FAPE to S.C. is attributable not only to Chariho but, to some degree, to N.C. and her attorney.
The Hearing Officer reviewed at length the faults underlying the October 2015 IEP meeting. First, the Hearing Officer noted that meeting was the first time the entire IEP team-including Chariho and N.C.-had reviewed S.C.'s prior IEP. Decision at 54-55. The Hearing Officer attributed this delay to both Chariho and N.C. requesting further evaluations of S.C. and otherwise seeking additional information. See id. ; Vol. V, 17:3-11 (N.C.'s refusal to participate in a social history).
Second, the Hearing Officer noted that the IEP team had set "totally unrealistic" expectations for S.C. to attend school. Decision at 56. A short-term objective in the IEP was to have S.C. attend school daily by November of 2015, despite her history of excessive absence and school avoidance. Decision at 56; see S.C. Ex. 104A at 9. Oddly, even though the IEP had set this goal, it also had the expectation that S.C. would be in the classroom less than forty percent of the time. Decision at 56; see S.C. Ex. 104A at 16. The Hearing Officer noted that, "[i]t had to be obvious" that the services provided to S.C. were insufficient to get her to attend school; however, those services went unchanged. Decision at 57; see id. at 56. Indeed, the October 2015 IEP "basically provided the same program that was in existence prior to October 1, 2015." Decision at 56.
Even if those faults were wholly attributable to Chariho, there remains the fact that N.C. and her attorney walked out of the IEP meeting. The Hearing Officer described their approach to the meeting as "residential placement or nothing," a finding *387 supported by the record. Decision at 56; see Vol. II, 12:10-16 (N.C. testifying that her attorney asked Chariho's attorney "was he planning on doing anything regarding the Grove School, and he said no, and I think we packed up and left"); Vol. II, 13:22 (N.C. describing IEP meeting as "very short"); Vol. II, 14:11-12 (N.C. testifying that "we left quite abruptly"); see also Vol. VII, 29:4-30:6 (witness testifying that, after reviewing recommended, placement, N.C.'s attorney said "[t]his is bullshit" and abruptly left with N.C.), Although N.C. and her attorney may have disagreed with the recommendation-or specifically the lack of recommendation for the Grove School-this was an unreasonable response and hindered the collaborative nature of the IEP meeting. Cf. C.G. , 513 F.3d at 288 (rejecting reimbursement claim where "parents' actions disrupted the IEP process, stalling its consummation and preventing the development of a final IEP"); id. (holding that "parents' single-minded refusal to consider any placement other than a residential one," "whether or not well-intentioned, constitutes an unreasonable approach to the collaborative process envisioned by the IDEA").
Had N.C. remained, it is entirely possible that the parties could have developed an IEP that would have provided FAPE to S.C., including adequately addressing her attendance issues. Indeed, the alternative education plan proposed by Chariho subsequent to the meeting specifically targeted S.C.'s attendance issues. This plan provided for S.C. to spend time at Kindred Spirits, a therapeutic horseback riding program, as an incentive for her to leave home and attend school. See Chariho Ex. 1 at 1. While the Court does not offer an opinion on whether this plan could have provided S.C. with a FAPE, it certainly addressed her attendance issues, and was undoubtedly an improvement over what resulted from the October 2015 IEP meeting. See Vol. VIII, 90:3-10 (testimony by Dr. Feldman that alternative education plan is "a very good plan"); id. 89:6-25 (testimony of Dr. Leimkuhler that while alternative education plan is "excellent," it was not immediately appropriate, and instead "a good Phase II or Phase III plan" for S.C.).
Ultimately, however, a plaintiff need not "have a perfect case to be entitled to a compensatory education award." Stanton ex rel. K.T. v. Dist. of Columbia , 680 F.Supp.2d 201, 207 (D.D.C. 2010). It is S.C.'s burden to prove that, by a preponderance of the evidence, the Court should award her compensatory education. She has met that burden. S.C. was denied FAPE in part due to the misfeasance or nonfeasance of Chariho; the denial is not attributable entirely to the unreasonable action of her mother and her attorney.
Accordingly, this Court remands the matter to the Hearing Officer to determine the amount of compensatory education that is due, taking into account the behavior of the parties and which compensates S.C. for the education she was denied by the October 1, 2015 IEP's failure to provide her a FAPE. See Henry v. Dist. of Columbia , 750 F.Supp.2d 94, 99 (D.D.C. 2010).
B. One of S.C.'s earlier IEPs failed to provide her with a FAPE.
S.C. also challenges the Hearing Officer's failure to adequately address Chariho's provision of FAPE in two IEPs between November 2014 and October 2015. Although the Hearing Officer recognized deficiencies with S.C.'s IEPs during this time period, and found that at one point S.C. lacked "an IEP ... that would deliver FAPE" (Decision at 44), the Hearing Officer did not reach any firm conclusions or award any relief. Chariho, on the other hand, argues that it did provide a FAPE to S.C., and that if any IEPs were deficient, it is because of N.C.'s actions.
*388 Under the IDEA, a FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." Rowley , 458 U.S. at 188-89, 102 S.Ct. 3034. "[I]f personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction ... the child is receiving a [FAPE] as defined by the Act." Id.
"The primary vehicle for delivery of a FAPE is the child's IEP." Lessard v. Wilton-Lyndeborough Coop. Sch. Dist. , 518 F.3d 18, 23 (1st Cir. 2008). "The IEP must include, at a bare minimum, the child's present level of educational attainment, the short- and long-term goals for his or her education, objective criteria with which to measure progress toward those goals, and the specific services to be offered." Id. ; see 20 U.S.C. § 1414(d)(1)(A)(i) ; 34 C.F.R. § 300.320(a).
An IEP must be "individually designed to provide educational benefit to [a particular] handicapped child." Rowley , 458 U.S. at 201, 102 S.Ct. 3034. The IEP "need only supply 'some educational benefit,' not an optimal or an ideal level of educational benefit, in order to survive judicial scrutiny." Lessard , 518 F.3d at 23-24 (quoting Mr. & Mrs. R. , 321 F.3d at 11 ). And an IEP striving to provide an "appropriate" educational benefit "cannot... be judged exclusively in hindsight." Roland M. , 910 F.2d at 992. "[A]n IEP must take into account what was, and was not, objectively reasonable ... at the time the IEP was promulgated." Id.
1. The November 2014 IEP could not provide S.C. a FAPE.
The first IEP S.C. challenges was issued in November 2014. See S.C. Ex. 77. The Hearing Officer called this "a preliminary IEP," citing to the IEP team's "need for further assessments and review." Decision at 43. However, the IDEA does not provide for "preliminary" IEPs and instead sets forth what is required in an IEP. See 20 U.S.C. § 1414(d)(1)(A)(i) ; 34 C.F.R. § 300.320(a) ; see also Myles S. ex rel. S.S. v. Montgomery Cty. Bd. Of Educ. , 824 F.Supp. 1549, 1554 (M.D. Ala. 1993) ("The IDEA describes the content of an IEP and makes no mention of a preparatory or 'interim' IEP."). Accordingly, the November 2014 IEP must be assessed under the requirements that apply to all IEPs.[7]
The Hearing Officer found that the November 2014 IEP had "few specifics." Decision at 43. The Court agrees. At the outset, the deficiencies are obvious and acknowledged: there is repeated placeholder language that certain information is not available. For example, the IEP does not state how S.C.'s preferences, interests, and goals were obtained-it just says that, because S.C. cannot attend school, information will be gathered later and her IEP revised, S.C. Ex. 77 at 4; see also id. at 5 (repeating same language for measurable post-school goals).
In terms of present levels of academic achievement and functional performance, *389 the IEP identifies "coping skills" as a need. Id. at 6. It also identifies "problem solving skills" as a measurable annual goal, with the expectation of attending school "all day, every day," Id. at 9. However, it does not specifically state what coping and problem solving skills S.C. needs. As she points out:
Based on past history, there was an obvious need to focus on calming herself when anxious. There may also have been a need to focus on conflict resolution skills. There could also have been a need to work on remaining motivated. There could have been a combination of those needs. The IEP never tells us, and thus we are left in the dark as to precisely what S.C. was expected to be able to do at the end of the IEP, or the extent to which she would be able to do it, or how we would know when she had accomplished the skill.
ECF No. 10 at 39. The IEP does suggest that some of these skills can be measured by her attendance. S.C. Ex. 77 at 9. However, this is not an objective criterion with which to measure her success: an increase in attendance does not necessarily mean that S.C. has developed those skills. For example, S.C.'s attendance increased when she lived with her father, who took her off her medications and out of therapy-but that does not mean she developed problem solving and coping skills in that time period.
In any event, even if attendance were a reliable benchmark for measuring the development of undefined problem solving and coping skills, numerous other "areas to be addressed" during this IEP have no goals set forth at all, including social skills, self-determination/self-advocacy, study skills, and attention. See id. at 7.
To be sure, the IEP does contain more concrete information in other areas, such as measurable goals for her math and algebra needs, as well as specific services to be offered. See id. at 10, 13, 14. However, it is not sufficient that the IEP had only some of the "bare minimum" requirements for an IEP. Lessard , 518 F.3d at 23. Nor was the need for more information an objectively reasonable basis for these fundamental flaws. As Chariho acknowledges, in the run up to the November 2014 IEP meeting, "Dr. [Michael] Vergnani conducted the clinical observation. Ms. [Elizabeth] Sanfilippo did the educational evaluation. Ms. [Jane] Cronin invested far more time than Dr. Leimkuhler ever did trying to gather background information on S.C." ECF No. 17-1 at 92 (citations omitted). Even if the Court accepts Chariho's argument that N.C. improperly interfered with Ms. Sanfilippo's evaluation, see ECF No. 17-1 at 93, the school district offers no explanation why the information gathered by Dr. Vergnani, Ms. Cronin, and Dr. Leimkuhler was insufficient to develop an IEP that met minimum requirements.[8]
Because of these deficiencies, the November 2014 IEP was not designed to provide S.C. educational benefit, and thus, she was denied a FAPE during the period this IEP was in effect.
2. The March 2015 IEP could provide S.C. a FAPE.
S.C. next challenges the March 2015 IEP.[9] Two days before the March IEP team meeting, Chariho received a letter from Wendy Miller, LICSW, recommending *390 that the school district incorporate aspects of DBT into its plans for S.C. S.C. Ex. 81. Chariho represents that this is "the first time that any clinician had raised the issue of DBT to Chariho." ECF No. 17-1 at 94. During the next month, Dr. Feldman evaluated S.C. at the request of both N.C. and Chariho. See S.C. Ex. 85; Vol. VIII, 33:13-21. As discussed earlier, a central recommendation of Dr. Feldman was that S.C. undergo DBT. S.C. Ex. 85 at 5. The IEP team subsequently met in early April to review Dr. Feldman's report. S.C. Ex. 86.
This IEP was a marked improvement over its predecessor. While continuing to recognize "coping skills" and "problem solving skills" as areas in need of improvement, this IEP adds specific, DBT-related goals for S.C. to improve in these areas. S.C. Ex. 89 at 11. Specifically, the IEP contemplates that, by June, S.C. is to understand concepts of mindfulness, distress tolerance, and interpersonal relationships, while by September, demonstrating skills in those areas. Id. Ultimately, the hope was that S.C. "will implement DBT skills during times of duress." Id. This IEP also dramatically increases the specific services provides for S.C. Compare S.C. Ex. 77 at 14 (listing only counseling), with S.C. Ex. 89 at 15 (listing thirteen specific services).
S.C. counters by noting that she was expected to return to school by May 2015, even though she had only been undergoing DBT for a short period of time and was not even expected to understand DBT concepts until the last day of school. ECF No. 10 at 44; see S.C. Ex. 89 at 9, 11. However, the record shows that may not necessarily be what Chariho contemplated. While the IEP says that the expectation is that S.C. will attend school "all day, every day" (S.C. Ex. 89 at 9), the proposed reintegration program shows something different. Specifically, this plan contemplates that S.C. return to school for two hours a day in May; for four hours a day in June; and, after entering the extended school year program, that S.C. be a full-time student by August. S.C. Ex. 87. These dates do align with the goal of having S.C. understand DBT concepts by June and develop DBT skills by September. See ECF No. 89 at 11.
Moreover, S.C. would have more support in place this time, including a contact person in school to help her, particularly when in crisis; extra time and breaks on assessments; and assistance with organization and time management skills. Id. at 15. It may be the case that getting S.C. to school by May for even a few hours a day was ambitious, but given the step-up approach, the supports in place, and the ongoing DBT skills she was developing, it was reasonably ambitious. See Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1 , --- U.S. ----, 137 S.Ct. 988, 1000, 197 L.Ed.2d 335 (2017).[10]
*391 The Court concludes that the March 2015 IEP was designed to provide S.C. educational benefit. Its corrections to the November 2014 IEP are sufficient such that it meets at least the minimum requirements for S.C. to derive educational benefit from it. See Lessard , 518 F.3d at 23-24. However, these corrections appear attributable to developments occurring no earlier than April 15, 2015. See S.C. Ex. 87. S.C. is thus entitled to a compensatory education award for the period from November 25, 2014, through April 15, 2015. Because this matter is already being remanded to the Hearing Officer, the Court instructs the Hearing Officer to determine an appropriate compensatory education award for S.C.'s denial of FAPE during that period.
IV. CONCLUSION
For the foregoing reasons, this Court reverses in part the Decision of the Hearing Officer. Accordingly, S.C.'s motion for summary judgment (ECF No. 10) is GRANTED and Chariho's motion for summary judgment (ECF No. 17) is DENIED. The matter is remanded to the Hearing Officer to determine:
1. A compensatory education award for S.C.'s denial of FAPE as of October 1, 2015, which takes into account the behavior of the parties during the October 1, 2015 IEP meeting; and
2. A compensatory education award for S.C.'s denial of FAPE between November 25, 2014, and April 15, 2015.
IT IS SO ORDERED.

The Decision is docketed at ECF No. 1-1.

"A 504 Plan is generally intended to remove barriers and/or provide modifications or accommodations to allow equal access to education, i.e., a level playing field, to students with physical and/or mental disabilities." Chariho Reg'l Sch. Dist. v. C.P. ex rel. Mrs. P. , C.A. No. 09-161 S, 2009 WL 4015604, at *1 n.1 (D.R.I. Nov. 19, 2009).

The original due process complaint and supplement were not part of the administrative record sent to the Court. However, these documents were made part of the record at the February 28, 2018, hearing.

In an effort to avoid its waiver problem, Chariho asks in a footnote for leave to amend its answer by adding a counterclaim challenging this finding. See ECF No. 17-1 at 90 n.60. This request fails to comply with this Court's Local Rules on motions generally and on motions to amend specifically and is denied. See L.R. Cv 7, 15.

The Court similarly does not reach the issue of whether the Hearing Officer erred in assessing FAPE based on the October 2015 IEP alone-i.e., without incorporating the January 2016 alternative education plan. However, the Court notes that, if it could review these questions, it would have reached the same conclusions as the Hearing Officer: that the October 2015 IEP must be construed alone and that it failed to provide S.C. with a FAPE.

Dr. Feldman also testified that he was aware that S.C. had been hospitalized three times since her residential placement at Newport Academy (Vol. VIII, 85:13-22) and that this did not surprise him (Vol. VIII, 88:11-17). He explained: "[I]t's the nature of residential placement, that unless the placement is tied strongly to the family and the community, that any gains made will wash out." Vol. VIII, 88:18-22.

Chariho argues that the First Circuit does allow for "preliminary IEPs." ECF No. 17-1 at 93 & n.64. It cites the Court of Appeals' decision in Lt. T.B. ex rel. N.B. v. Warwick School Committee , where the First Circuit approved of a short-term IEP for a disabled child who had just moved to the school district, where the school lacked complete records for the child, and where no further information was given to the school. 361 F.3d 80, 84-85 (1st Cir. 2004). Regardless of nomenclature, the court evaluated this "proposed" document under the law and requirements that apply to all IEPs, See id. at 83-86. A school can-and should-adjust an IEP as needed, but it cannot escape its obligation to provide a FAPE to a disabled child by calling an IEP "preliminary."

Chariho also acknowledges that these evaluations took place within the sixty-day window contemplated by the IDEA regulations. ECF No. 17-1 at 92; see 34 C.F.R. § 300.301(c)(1)(i).

For the sake of simplicity, the Court refers to this IEP as the "March 2015 IEP." However, it is clearly the result of more than just the March 2015 meeting. Although the IEP team "first met to develop" this document in March (ECF No. 10 at 42), the team met again to revise this document in April (ECF No. 17-1 at 94). The document itself lists only March as the meeting date, though, says it is effective back to November 2014, and appears to have been printed in May of 2015. See generally S.C. Ex. 89. There also appears to be a nearly identical copy of this IEP in the record as S.C. Exhibit 98, which was printed in August of 2015, although it does not differ in any significant respect. See ECF No. 17-1 at 28. Nevertheless, the Court accepts the parties' representation that Exhibit 89 is the proper version of the IEP. See ECF No. 10 at 16 (citing S.C. Ex. 89); ECF No. 17-1 at 22, 94-95 (same).

S.C.'s other arguments, including that Chariho itself did not provide DBT, are unavailing. N.C. testified that she made an appointment for S.C. with Rhode Island CBT "before [Chariho] even had a chance," and that, by March, "everybody was working in the same direction of trying to get DBT services for [S.C.]" Vol. II, 121:13-25; see S.C. Ex. 86. Additionally, S.C.'s ultimate academic performance under this IEP is not a proper consideration. See Roland M. , 910 F.2d at 992.